

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-14-1999

# Concerned Citizens v. Slater

Precedential or Non-Precedential:

Docket 98-7462

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Concerned Citizens v. Slater" (1999). *1999 Decisions.* Paper 129.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/129

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 14, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-7462

CONCERNED CITIZENS ALLIANCE, INC.;
JOSEPH KREMPASKY,
Appellants

v.

RODNEY SLATER, Secretary, U.S. Department of
Transportation; KENNETH R. WYKLE, Administrator,
Federal Highway Administration; BRADLEY L. MALLORY,
Secretary, Pennsylvania Department of Transportation

On Appeal From the United States District Court
For the Middle District of Pennsylvania
(D.C. Civ. No. 98-cv-00107)
District Judge: Honorable Malcolm Muir

Argued: February 9, 1999

Before: BECKER, Chief Judge, McKEE, Circuit Judges
LEE, District Judge.*

(Filed May 14, 1999)

      ANDREA C. FERSTER, ESQUIRE
       (ARGUED)
      1100 Seventeenth Street, N.W.
       10th Floor
      Washington, DC 20036

      Counsel for Appellants

_____

*Honorable Donald J. Lee, United States District Judge for the Western
District of Pennsylvania, sitting by designation.

PAUL W. EDMONDSON, ESQUIRE
General Counsel
ELIZABETH S. MERRITT, ESQUIRE
 (ARGUED)
Associate General Counsel
LAURA S. NELSON, ESQUIRE
Assistant General Counsel
National Trust for Historic
 Preservation
1785 Massachusetts Avenue, NW
Washington, DC 20036

Counsel for Amici Curiae

DAVID BARASCH, ESQUIRE
United States Attorney
DULCE DONOVAN, ESQUIRE
 (ARGUED)
Assistant United States Attorney
Suite 217 Federal Building
228 Walnut Street
Harrisburg, PA 17108

PAUL A. TUFANO, ESQUIRE
General Counsel
JOHN M. HRUBOVCAK, ESQUIRE
Assistant Counsel
ROBERT J. SHEA, ESQUIRE
Assistant Chief Counsel
ANDREW S. GORDON, ESQUIRE
Chief Counsel
Commonwealth of Pennsylvania
Department of Transportation
Office of Chief Counsel
555 Walnut Street, 9th Floor
Harrisburg, PA 17101-1900

Counsel for Appellees

OPINION OF THE COURT

BECKER, Chief Judge.

Highways and historic districts mix like oil and water, and when a new highway must go through an historic area, historic preservationists and federal and state highway officials are likely to clash over the preferred route. Such controversies take on a legal cast as the result of Section 4(f) of the Department of Transportation Act, 49 U.S.C. S 303(c)(2) (amended by and codified at 23 U.S.C. S 138), which provides:

> [T]he Secretary [of Transportation] shall not approve any program or project . . . which requires the use of any . . . land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such . . . historic site resulting from such use.

Id.

The situs of the present controversy is Danville, Pennsylvania, a picturesque county seat overlooking the Susquehanna River. Danville, which contains an historic district that was nominated to the National Register of Historic Places in 1994, is joined with Riverside, the town across the river, by a deteriorating bridge. In the early 1980s, federal and state agencies decided that the bridge had to be replaced. The plaintiffs, Danville area residents who formed the Concerned Citizens Alliance, sued the U.S. Department of Transportation, the Federal Highway Administration ("FHWA"), and the Pennsylvania Department of Transportation ("PennDoT") in the District Court over the defendants' selection of a bridge alignment that would send traffic through Danville along Factory Street after it exited the new bridge.

The plaintiffs contend that the defendants failed to comply with the requirements of Section 4(f)(2) by arbitrarily and capriciously selecting the Factory Street

3

Underpass alignment as the preferred alternative. The plaintiffs also submit that the defendants ignored the conclusion of the Advisory Council on Historic Preservation ("ACHP") that the Mill Street alternative would minimize harm to the Danville Historic District. Although both alternatives pass through the Historic District, plaintiffs maintain that the defendants failed to adequately support their conclusion that the Underpass alternative was preferable. Additionally, the plaintiffs allege that the defendants violated both Section 4(f) and the National Environmental Policy Act ("NEPA"), 42 U.S.C.S 4321 et seq., by failing to evaluate in detail an alternative that would include, in addition to rebuilding the current bridge, building a second bridge upstream to allow traffic to reach the nearby connection to Interstate 80 without going through the center of Danville. The District Court granted summary judgment for the defendants on all grounds, and this appeal followed.

We devote our attention to three critical issues. First, we consider the level of deference the FHWA owes to the ACHP, which is an expert agency created to comment on federally-assisted projects involving historic properties, and whether the appropriate deference was given. Second, we evaluate whether the defendants acted arbitrarily in concluding that the Factory Street Underpass alternative would inflict the least amount of harm on the Historic District. Third, we determine whether the defendants violated NEPA. We conclude that, although the views of the ACHP are entitled to deference, the ACHP cannot mandate a particular outcome. Rather, we must carefully review the record to assure that the views of the ACHP were in fact considered and any concerns it raised were answered. We also conclude, based on the entire administrative record, that they were, and that the defendants did not act arbitrarily or capriciously in selecting the Factory Street Underpass alternative. Finally, we agree with the District Court that the plaintiffs' NEPA claim is without merit. We therefore will affirm the judgment of the District Court.

I. Facts and Procedural History

The Danville-Riverside Bridge carries Pennsylvania Route 54 across the Susquehanna and links Danville to Riverside.

4

Route 54 (in the form of Mill Street) passes through the center of Danville and provides access to Interstate 80 a few miles northwest of Danville. In 1983, defendants FHWA and PennDoT decided to replace the old Danville-Riverside Bridge, which was becoming unsafe.

Some twelve options were put on the table. The alternatives relevant to this appeal included the"No-Build" alternative, the Mill Street alternative ("MS alternative"), the Factory Street At-Grade alternative ("FSAG alternative"), the Factory Street Underpass alternative ("FSU alternative"), and the Mill Street plus Bypass alternative ("MS&B alternative"). Originally, the goal of the bridge replacement project was just that: to replace the bridge. Therefore, the FHWA initially refused to consider the MS&B alternative, since it involved not only replacing the existing Danville-Riverside Bridge but also building another bridge 1.2 miles upstream to siphon off "through" traffic to reduce the number of cars and trucks passing through Danville's Historic District. However, Mill Street, on which many shops and businesses are located, is the main commercial street in the district, and in response to comments from the Mill Street business community, the FHWA broadened the stated purpose of the project to include reducing traffic congestion to restore the economic health of Mill Street. The MS&B alternative was therefore placed on the table, although it never received detailed evaluation.

The Evaluation of Project Need listed twenty objectives that the bridge replacement project was to fulfill. These included replacing the deteriorating bridge; minimizing vehicle delay and traffic congestion on Mill Street; maintaining a link between Danville and Riverside through the year 2013; managing traffic congestion on Factory Street; restoring the Mill Street neighborhood, quality of life, and business district; and minimizing pedestrians' exposure to traffic.

Importantly, both Mill Street and Factory Street are in the Historic District. The Final Environmental Impact Statement ("FEIS") describes the collection of commercial, civic, and residential structures along Mill Street as dating "from the mid-nineteenth century to the early twentieth. The two and three story buildings are predominantly

Italianate in style with features including blind arches, corbelling, bracketed and highly decorative roof and storefront cornices, columns and window hoods." The FEIS also describes the buildings on West Market Street, a street linking Mill and Factory Streets: "A range of architectural styles are represented including Federal, Greek Revival, Italianate, Second Empire, Victorian Eclectic, Queen Anne, Shingle and Georgian Revival." Factory Street, which is a smaller street one block west of Mill Street, contains mostly residences--both historic and non-historic--and boasts "large, stately buildings" that were "the homes of Danville's wealthy industrialists who shaped the iron industry as well as the architectural character of the present day West Market Street neighborhood."

Currently, bridge traffic flows along Mill Street and travels the length of the Historic District, although to avoid the congestion, some traffic cuts west on West Market Street to access Factory Street, which eventually connects up with Route 54. The FSU alternative would realign traffic coming off the bridge on the Danville side by routing traffic down Factory Street and through a 345-foot "cut-and-cover" underpass that would begin between Front and Market Streets and end between Market and Mahoning Streets. The MS alternative would replace the bridge but maintain the current traffic flow along Mill Street. The FSAG alternative would simply route traffic onto and along Factory Street without directing traffic through an underpass.

In considering the various alternatives, the FHWA engaged in the requisite Section 4(f) and NEPA analyses. As we detail below, Section 4(f) requires the FHWA to ensure that there are "no prudent and feasible" alternatives that would avoid using historic properties, and, in the absence of a feasible alternative, to undertake "all possible planning to minimize harm" to the Danville Historic District. In performing its 4(f) analysis, the FHWA garnered input from the ACHP and the Pennsylvania Historical and Museum Commission ("PHMC"). Both historical groups notified the FHWA that they preferred the MS alternative. In a letter dated January 14, 1994, the ACHP complained that the FSU alternative, which was favored by FHWA and which

6

included the underpass, would destroy vistas, landscaping, and pedestrian and vehicle circulation patterns, and would create an overwhelming visual intrusion in the form of large retaining walls. The ACHP also feared that the increased traffic on Factory Street would create noise and fumes that would be out of character in that part of the district. Noting that Mill Street was the traditional gateway into the town, the ACHP felt that traffic was not out of character there, and that the MS alternative was thus the "least harm" alternative under 4(f)(2).

In response to the ACHP's concerns about the FSU alternative, PennDoT retained Mary Means & Associates, a private consulting firm with expertise in urban design and economic analysis of historic areas, to evaluate the MS and FSU alternatives. The Means firm wrote a report that acknowledged that the FSU cut-and-cover alternative would in fact do irreparable damage to the town, but concluded that the FSU option would cause the least damage to the long term viability of the Historic District. The Means Report also stated that the MS alternative failed to relieve the serious congestion and turning movements caused by the constant truck traffic in an older downtown.

Pursuant to NEPA, and as part of the decisional process, the FHWA prepared first a Draft and then a Final Environmental Impact Statement ("EIS," "DEIS," or "FEIS"), both of which contained the required Section 4(f) evaluations. The EIS considered all of the alternatives listed above (and more), but concluded that only four merited detailed study as reasonable and prudent options: the FSU alternative, the MS alternative, the FSAG alternative, and the No-Build alternative. The FHWA did not perform a detailed study of the MS&B alternative, since the Agency deemed that alternative unreasonable.

The FHWA ultimately selected the FSU alternative. The ACHP and the FHWA signed a Memorandum of Agreement ("MOA") which stated that the FSU alternative had been chosen and prescribed several measures to mitigate its impacts. The FHWA subsequently signed a Record of Decision ("ROD"), memorializing the FSU alternative as the selected alignment for the project. In its Section 4(f) analysis, the ROD concluded that the FSU alternative

7

would best minimize harm to the Historic District by (i) physically and visually separating traffic from the Historic District; (ii) reducing traffic on Mill Street; and (iii) requiring the demolition of a smaller contributing historic structure than the MS alternative would. The ROD also deemed the Mill Street alternative undesirable because the Mill Street traffic would detract from the atmosphere in the historic downtown area.

Since construction on the bridge was scheduled to begin in July 1998, the plaintiffs, who continued to object to the selection of the FSU alternative, moved for a temporary restraining order and a preliminary injunction in late May 1998.[1] The district court denied the motions.[2] On the same day, the parties also filed cross-motions for summary judgment. In response to the defendants' motion, the plaintiffs attached a letter from the ACHP dated June 29, 1998, explaining that its decision to sign the MOA did not constitute a retraction of its earlier statement that it preferred the MS alternative. The District Court granted the defendants' motion to strike the ACHP letter from the record.[3] It also denied plaintiffs' motion for a permanent injunction, and then granted summary judgment for the defendants.

_____

1. At oral argument in February 1999, the parties represented that construction on the bridge had not yet begun.

2. Shortly thereafter, the plaintiffs simultaneously filed an interlocutory
appeal from the denial of the TRO and a motion for an injunction pending appeal. A panel of this court denied plaintiffs' motion for an injunction pending appeal and dismissed the appeal from the denial of the TRO.

3. The plaintiffs contend that the District Court abused its discretion in striking the ACHP letter from the record, since that letter clarifies the ACHP's current position on the FSU alternative. The ACHP points out that its decision to sign the MOA did not indicate its concurrence in the FSU alternative, but rather bound the defendants to the mitigation measures contained therein. Indeed, the defendants concede that the MOA "asks for concurrence on mitigation measures not concurrence on the selected alternative." We need not decide whether the District Court abused its discretion in striking the document because, even factoring in the ACHP's continued opposition to the FSU alternative, we still conclude that the FHWA did not act arbitrarily in selecting that alternative.

8

This appeal followed, over which we have jurisdiction pursuant to 28 U.S.C. S 1291. The plaintiffs seek the cessation of preparatory construction activities and a remand to FHWA with instructions to comply with Section 4(f) and NEPA. When, as here, we are reviewing an administrative agency's final decision under S 706 of the Administrative Procedure Act, 5 U.S.C. S 701 et seq., we review the district court's summary judgment decision de novo, while "applying the appropriate standard of review to the agency's decision." See Sierra Club v. Slater, 120 F.3d 623, 632 (6th Cir. 1997). The appropriate standards of review of the agency's decisions are explained below.

II. Discussion

A. The Requirements of Section 4(f)

Because the Danville-Riverside Bridge replacement project is a federal-aid project that will, under any proposed alternative, "use" at least one historic structure in Danville's Historic District,4 the project must satisfy the requirements of Section 4(f) of the Department of Transportation Act, 23 U.S.C. S 138 ("Section 4(f)"), as well as the requirements of NEPA, 42 U.S.C. S 4332(2)(C) (mandating an EIS and consultations with federal agencies that have special expertise when an agency undertakes major federal action affecting the quality of the human environment). Section 4(f) mandates that the protection of historic properties, parks, recreation areas, and wildlife refuges be given paramount importance in transportation planning. As discussed above, it does so by requiring the Secretary of Transportation to use non-historic property unless there is no other feasible alternative, see Section

_____

4. Both courts and the Department of Transportation have explained what "use" means in this context. "The term `use' is to be construed broadly, not limited to the concept of a physical taking, but includes areas that are significantly, adversely affected by the project." See Morongo Band of Mission Indians v. Federal Aviation Admin., 161 F.3d 569, 583 (9th Cir. 1998) (quoting Adler v. Lewis, 675 F.2d 1085, 1092 (9th Cir. 1982)); Department of Transportation Order No. 5610.1A, P 9(c)(1), 36 Fed. Reg. 23681 (1971).

4(f)(1), and to minimize harm to the historic property once it is determined that such land must be used, see Section 4(f)(2). It is undisputed that only Section 4(f)(2) is at issue in this case, since each alternative before the FHWA involved a "use" of at least one historic structure in the Historic District.5

Under Section 4(f)(2), the Secretary of Transportation must perform a balancing test when weighing the alternatives under consideration. We agree with the Eleventh Circuit's explication that

> [S]ection 4(f)(2) requires a simple balancing process which totals the harm caused by each alternate route to section 4(f) areas and selects the option which does the least harm. The only relevant factor in making a determination whether an alternative route minimizes harm is the quantum of harm to the park or historic site caused by the alternative. Considerations that might make the route imprudent, e.g., failure to satisfy the project's purpose, are simply not relevant to this determination. If the route does not minimize harm, it need not be selected.

Druid Hills Civic Ass'n v. Federal Highway Admin., 772 F.2d 700, 716 (11th Cir. 1985) (citations omitted); see also Louisiana Envtl. Soc'y, Inc. v. Coleman, 537 F.2d 79, 85-86 (5th Cir. 1976).

_____

5. Although the No-Build alternative would not"use" any historic property, the plaintiffs do not argue that the defendants violated 4(f)(1) by failing to select the No-Build alternative. Section 4(f)(1) specifically
requires that the Secretary must select an alternative that does not use historic property unless that alternative is infeasible. Here, because the No-Build alternative would not accomplish any of the Project Needs, it is clear why the plaintiffs do not argue that this alternative was feasible.

Likewise, while the No-Build alternative was considered in the defendants' 4(f)(2) analysis, we conclude below that there is an implicit "reasonable and prudent" requirement in Section 4(f)(2). See infra at Part II.D. Therefore, while the No-Build alternative technically would impose the least harm on historic property under 4(f)(2), the plaintiffs do not argue that it was arbitrary not to select the No-Build alternative as the preferred option.

In a Section 4(f) challenge, the plaintiff bears the burden of showing by a preponderance of the evidence that the Secretary acted improperly in approving the use of protected property. See Ringsred v. Dole, 828 F.2d 1300, 1302 (8th Cir. 1987) (citing Louisiana Envtl. Soc'y, Inc. v. Dole, 707 F.2d 116, 119 (5th Cir. 1983)). Under Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971), the Supreme Court made clear that while the Secretary of Transportation's decision is entitled to a presumption of regularity, a court nevertheless must subject the Secretary's decision to "probing, in-depth" review. See id. at 415.

When reviewing a Section 4(f)(2) determination, a court must decide whether the Secretary's ultimate decision was arbitrary, capricious, or an abuse of discretion. See Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 204 (D.C. Cir. 1991) (applying arbitrary and capricious review to Secretary's Section 4(f)(2) determination); Coalition on Sensible Transp., Inc. v. Dole, 826 F.2d 60, 65-66 (D.C. Cir. 1987) (same). This assessment requires an evaluation of whether the decision was based on consideration of the relevant factors and whether there was a clear error of judgment. See Overton Park, 401 U.S. at 416. The Section 4(f)(2) balancing process "permits the Secretary to engage in a broad consideration of the `relative harm' arising from various alternates [sic]." Coalition on Sensible Transp. Inc. v. Dole, 642 F. Supp. 573, 603 (D.D.C. 1986), aff'd, 826 F.2d 60 (D.C. Cir. 1987).

The plaintiffs--who believe that the FSU alternative is not the alternative that would cause the least harm to the Danville Historic District--claim that the defendants have violated Section 4(f)(2) in three ways. First, they allege that the FHWA "completely ignore[d]" the ACHP's conclusion that the MS alternative was preferable. Second, plaintiffs contend that each of the defendants' stated reasons for selecting the FSU alternative deserves no weight, and that nothing in the administrative record supports the conclusion that the FSU alternative best minimizes harm. Third, they argue that the defendants arbitrarily excluded from detailed consideration an alternative that might have imposed the least harm on the Historic District--the MS&B

11

alternative. In light of these arguments, we will review for abuse of discretion the Secretary's decision that the FSU alternative would do the least harm to Section 4(f) resources.

B. Section 106: Deference to the Advisory Council on
       Historic Preservation

The initial basis on which plaintiffs contend that the defendants' actions were arbitrary and capricious is that the defendants failed to take into consideration the comments of the ACHP. This consideration stems from 16 U.S.C. S 470f (also known as "Section 106"), under which the Secretary must take into consideration the comments of the ACHP when contemplating an undertaking that will affect a site or structure listed in the National Register. As a preliminary matter, we must determine what level of deference the Secretary owes to the ACHP's assessment of the impacts of the MS and FSU alternatives on the Danville Historic District.

The ACHP is an expert federal agency created by Congress pursuant to the National Historic Preservation Act (codified at 16 U.S.C. S 470 et seq. (1994)) ("NHPA"). Under Section 106 of the NHPA, the ACHP must be given a "reasonable opportunity to comment" on the effect of federally-assisted projects on historic properties. See id. We must decide what weight a federal agency must give to the ACHP's comments; the amount of deference owed the ACHP will factor into our analysis of whether the Secretary's calculus was arbitrary or capricious.

Both courts and the relevant regulations suggest that Section 106 imposes a limited set of obligations on federal agencies. See Waterford Citizens' Ass'n v. Reilly, 970 F.2d 1287, 1290 (4th Cir. 1992); 36 C.F.R. S 60.2(a); 36 C.F.R. S 800.6 (explaining the Section 106 process and requiring that the Agency "consider" the ACHP's comments). Though the text of Section 106 does not specify what the Advisory Council's "opportunity to comment" on a project entails, the Advisory Council's regulations and the legislative history demonstrate that the total response required of the agency is not great. See Waterford, 970 F.2d at 1290 (noting that

12

Section 106 is silent on the proper disposition of a disagreement between the Advisory Council and the agency over the potential adverse effect of an undertaking). Indeed, even the ACHP's own regulations, see 36 C.F.R. S 60.2(a), state that after having given the ACHP an opportunity to comment, "the Federal agency may adopt any course of action it believes is appropriate. While the Advisory Council comments must be taken into account and integrated into the decisionmaking process, program decisions rest with the agency implementing the undertaking." See id.

The Waterford court concluded, "There is thus no suggestion in either the statute or the legislative history that section 106 was intended to impose upon federal agencies anything more than a duty to keep the Advisory Council informed of the effect of federal undertakings and to allow it to make suggestions to mitigate adverse impacts on the historic sites under its protection." See 970 F.2d at 1291; see also Vieux Carre Property Owners v. Brown, 948 F.2d 1436, 1447 (5th Cir. 1991) ("[B]ecause, as the Corps points out, the Advisory Council's comments are advisory only and do not bind the Corps to a particular course of action, the Corps might decide not to require mitigation measures even if the Advisory Council should recommend them."); Illinois Commerce Comm'n v. Interstate Commerce Comm'n, 848 F.2d 1246, 1260-61 (D.C. Cir. 1988) (noting that Section 106 is a "stop, look, and listen" provision that merely requires that an agency acquire information before acting). We agree.

While the ACHP's recommendations do not and cannot control agency decisionmaking, the relevant agency must demonstrate that it has read and considered those recommendations. See Coalition Against a Raised Expressway, Inc. v. Dole, No. 84-1219-C, 1986 WL 25480 (S.D. Ala. Oct. 20, 1986) (holding that the agency complied with Section 106 when its responses to ACHP comments indicated that it took the comments into consideration even though it ultimately disagreed with them), aff'd, 835 F.2d 803 (11th Cir. 1988).6

_____

6. One court has suggested that judgments made by the ACHP deserve "great weight." Preservation Coalition, Inc. v. Pierce, 667 F.2d 851, 858 (9th Cir. 1982). However, Pierce cited no case or statute in support of its
"great weight" language, and we can find no support for its conclusion.

13

Counseled by the congressional inclusion of Section 106 in the NHPA, we acknowledge historic preservation as a highly important societal interest. As a civilization, we suffer a terrible loss if we do not make every reasonable effort to preserve our heritage, which may be enshrined in bricks and mortar as well as in books and documents. We think, however, that Congress was delivering this message primarily to the federal agencies, rather than trying to instruct federal appellate courts to inject some subtle (and inevitably elusive) calibration into their process of reviewing historic preservation cases. Given the plethora of federal regulatory statutes that impose obligations on the judiciary to review administrative decisions, such a construction might lead to a hodge-podge jurisprudence.

We agree that the FHWA must take the ACHP's comments into account when balancing alternatives, and must demonstrate that it gave the ACHP's conclusion genuine attention: Congress did not create the ACHP so that it could be a toothless agency. However, the ACHP's own regulations are clear that the acting federal agency need not agree with the ACHP's determination that a given alternative is the "least harm" alternative. In sum, a federal agency undertaking a project affecting historic properties is not obligated to give the ACHP's opinion so much weight that it is foreclosed from making its own decision, though it must make clear in the record that the ACHP's comments were taken seriously.

The ACHP opined that "the Mill Street alignment best avoids or reduces the effects of this project on the Danville Historic District and should be considered the preferable alignment." The ACHP reasoned that the proposed mitigation of the cut-and-cover section would not adequately minimize the effects of added traffic on the Factory Street neighborhood; that the FSU option would create "harmful visual impacts"; and that the underpass would destroy important topographical, landscape, and circulation systems that contribute to the Historic District's character and significance. Although they acknowledge the correctness of the proposition that the ACHP's concurrence in the selected alternative is not required by statute, plaintiffs (in effect) nonetheless contend that because the

14

FHWA did not agree with the ACHP that the MS alternative imposed the least harm, the FHWA must have acted capriciously.

We address their contention under our proper standard of review. Despite the plaintiffs' assertions that the defendants ignored the ACHP's comments and thus acted arbitrarily in selecting the FSU alternative, the administrative record reveals that the defendants seriously took into consideration the ACHP's objections. First, the record shows that the ACHP has been heavily involved in this project. A number of letters and memoranda that passed between the parties--either written by the ACHP itself or by FHWA and PennDoT--indicate that the defendants were aware of the importance of trying to gain the ACHP's support for the FSU alternative. See, e.g., A 584 (letter from PennDoT) ("We concur that consultation with the State Historic Preservation Officer (SHPO) and the Advisory Council on Historic Preservation is crucial for advancement of the preferred alternative."); A 589 (letter from FHWA) (scheduling a conference call to discuss ACHP's January 14 letter expressing a preference for the MS alternative); A 652 (Mary Means letter) (making revisions in draft report based on work session with PHMC and ACHP).

Second, after the ACHP first expressed its concerns, the defendants hired a consultant suggested to them by PHMC. Third, the ACHP and PHMC were involved in drafting the mitigation measures for the selected alternative. The record thus demonstrates that the defendants considered the ACHP's comments, and at least to some degree integrated those comments into the decisionmaking process both substantively and procedurally. Section 106 does not require more. We do not, however, put this subject to rest with these comments about the ACHP's role; rather, in considering whether the Secretary acted arbitrarily and capriciously under Section 4(f)(2), we perforce examine the substantive basis for the defendants' disagreement with the views of the ACHP.

15

C. Did the Secretary Act Arbitrarily and Capriciously
       Under 4(f)(2)?

In addition to their concern about the way the defendants
treated the ACHP's opinion, the plaintiffs submit that there
is no support in the administrative record for choosing the
FSU alternative as the "least harm" alternative, and that
the defendants therefore acted arbitrarily in choosing that
alternative as the bridge replacement plan. Specifically, the
plaintiffs argue that the defendants ignored the noise, air
quality, vibration, traffic, and visual impacts that the FSU
alternative would have on the Historic District; that the
Means Report does not support defendants' position
because it focused on the economic health of the town
rather than its historic preservation; and that Mary Means
was biased toward the FSU alternative since she was later
selected to implement part of the mitigation plans under
that alternative. We will address the first two concerns; we
find no merit in the plaintiffs' third claim, since Means
drafted her report with no knowledge that she might later
be retained as part of the mitigation design team, and we
reject it summarily.

1. Factory Street and West Market Street

First, the plaintiffs claim that the FSU alternative will
destroy the Factory Street "streetscape" and will create a
visual intrusion in the form of retaining walls around the
underpass.[7] The ACHP concluded that the streetscape at
the intersection of Factory and West Market Streets (under
which the underpass would run) was an important element
of the Historic District that would be completely altered by
the underpass. Based on National Park Service guidelines,
which acknowledge that intangibles like streetscapes and
layouts of roads are important to the integrity of historic
districts, see U.S. Dep't of Interior, National Park Service,
National Register Bulletin #15, How to Apply the National

_____

7. While the term "streetscape" does not appear in the NHPA or in the
regulations promulgated thereunder, it is useful in a Section 106
analysis. We take it to refer to the visual impact of, and the interplay
between, the natural and architectural elements that comprise the
affected area.

16

Register Criteria for Evaluation 44 (Rev. 1991), we think that the plaintiffs are correct that the defendants must consider more than the individual buildings and structures in an historic district when analyzing the impact of a project.

In the instant case, however, the record reflects that the defendants have considered the effect of the FSU alternative on the extant streetscape. First, the underpass itself is an attempt to minimize the effect of increased above-ground traffic on Factory Street. It not only eliminates traffic on a portion of Factory Street, but it also eliminates it at the most important--and beautiful--intersection in the Historic District: the intersection of Factory and West Market Streets.[8] Second, the planned mitigation measures in the FEIS and MOA will reduce the change imposed on the streetscape of Factory Street. The measures create a cover section on top of the underpass, at street level, that will offer an open space in the Historic District. The landscaping and design of the cover will be developed in consultation with local officials, a citizens' advisory committee, and the State Historic Preservation Office, to be in keeping with the current character of Factory Street. Apparently, features such as gas lamps and attractive landscaping are contemplated.

The plaintiffs submit that even if the top of the underpass were designed to mimic a functional street, the presence of safety fencing and vehicle barriers will still be intrusive, and the underpass will, by definition, change the streetscape of much of Factory Street. We agree. However, the street-level surface of the underpass will offer some aesthetic benefits, and the plaintiffs' criticism, while valid, must be placed in the entire balancing calculus.

The plaintiffs' second argument is not unlike theirfirst: that the defendants have ignored that the FSU alternative would alter the existing character of Factory Street. As the plaintiffs correctly note, "Adverse effects on historic properties include, but are not limited to: . . .[i]ntroduction of visual, audible, or atmospheric elements that are out of

_____

8. The FEIS states that the "focal point" of Market Street "is the intersection of Market and Factory Streets."

17

character with the property or alter its setting." See 36 C.F.R. S 800.9(b)(3). The plaintiffs characterize Factory Street as quiet and residential, in contrast to Mill Street, where heavy traffic is to be expected. To some extent, the defendants agree with this characterization, noting in the FEIS that Factory Street is residential in nature. However, it appears from the record that only one of the historic structures facing Factory Street is currently a residence, although a number of other historic structures, such as carriage houses and garages, front Factory Street. 9

The Secretary did not ignore this character-altering drawback to the FSU alternative; indeed, the Means Report acknowledges that the FSU alternative will affect the character of Factory Street, and balances it against other considerations. However, Factory Street's character may not be altered as drastically as the plaintiffs suggest, since Factory Street currently is exposed to a fair amount of traffic composed of cars and trucks that cut from Mill Street across Market Street onto Factory Street in order to avoid the heavy traffic on Mill Street. In addition, the Secretary took into account the benefits to the existing character of historic Mill Street in choosing the FSU alternative.

Third, the plaintiffs claim that the FSU alternative will isolate the part of West Market Street that lies west of Factory Street from the rest of the Danville Historic District by making it hard for pedestrians to cross Factory Street. We do not think that this argument has much to commend it. The cross streets of Mahoning, Market, and Front will

_____

9. There are four large residential structures at the intersection of Factory and West Market Streets, each of which has been deemed a contributing element to the Historic District. None of the four structures actually faces Factory Street. Moreover, Factory Street has experienced some commercialization, since a number of buildings have been transformed into executive and professional offices. The Evaluation of Project Need records that ninety people reside on Mill Street, in second- and third-story apartments over small stores and shops at street level, whereas six people reside on Factory Street. Two residences facing Factory Street would be "used" under the FSU alternative. One building is a non-contributing (that is, non-historic), multi-family dwelling; the other residence is a contributing structure at 9 Factory Street.

18

remain open to local traffic and existing sidewalks will be maintained. While portions of the west side of Factory Street will be slightly less accessible to pedestrians under the FSU alternative, this factor is not a critical one in determining whether the defendants acted arbitrarily.

## 2. Traffic

The plaintiffs also complain about the increased traffic volume on Factory Street that will occur under the FSU alternative. According to the plaintiffs, traffic would increase 400% on Factory Street under the FSU alternative. The defendants, by contrast, calculate that by the year 2013, traffic would have increased only 226%. Even if we assume that the plaintiffs' estimate is correct, traffic on West Market between Factory and Mill Streets is expected under the FSU alternative to drop by the year 2013 from 525 cars at peak hours to 125 cars at peak, a 420% decrease. Under the MS alternative, cars and trucks would continue to detour onto Factory Street to avoid Mill Street traffic, thus failing to abate traffic problems on either Factory or Mill Streets. However, under the FSU alternative, the traffic volume on Mill Street would decrease substantially. Therefore, though the FSU alternative will increase traffic on Factory Street, it will reduce traffic on other streets in the Danville Historic District. We therefore cannot hold that--based on traffic projections--it was arbitrary for the defendants to opt for the FSU alternative.

## 3. Noise, Exhaust, and Vibration

The plaintiffs argue that the defendants failed to consider the increased traffic noise and exhaust fumes that the underpass would foster. The record suggests otherwise. As for exhaust, the defendants calculated the expected carbon monoxide levels at seventeen sites and determined that none of the predicted concentrations would exceed National Ambient Air Quality Standards. While plaintiffs appear to be correct that the defendants did not study the impact of the predicted carbon monoxide levels on the historic structures on Factory Street, we do not believe that this omission alone renders the defendants' judgment arbitrary.

19

Regarding noise, it is clear that the defendants performed ample noise studies at fourteen selected sites on Market, Mill, and Factory Streets, and three sites in Riverside. Under the No-Build alternative, the noise levels at eleven of the seventeen sites would equal or exceed abatement levels. Under the MS alternative, the levels at eleven of the seventeen sites would equal or exceed abatement levels. Under the FSU alternative, the levels at eight of the seventeen sites would equal or exceed abatement levels. Comparing the alternatives by site, the decibel level is expected to be louder in 2013 under the MS alternative for eight sites, and louder under the FSU alternative for six sites.

The plaintiffs note that the FSU alternative would increase the noise impact from its present levels at nine of seventeen sites by 2013. They fail to note that the MS alternative would increase the noise impact from its present levels at all seventeen of the sites. Only one site will be directly impacted by portal noise under the FSU alternative; the structure on that site will be relocated. The plaintiffs also express concern that the underpass will eliminate only a small amount of noise relative to the intrusion it imposes on the area. However, the District Court found that there were "four large residential structures" at the intersection of Factory Street and West Market Street (all four of which are contributing structures to the Historic District) and that the noise impacts at the intersection of Factory and Market would be significantly lower under the FSU alternative than the MS alternative, since those four structures would be shielded from Factory Street noise by the underpass. In sum, from a noise standpoint, the FSU alternative is quite clearly the preferable choice.

Although the plaintiffs do not indicate that they are concerned about the effects of vibration on historic structures under the various alternatives, the record indicates that the FSU alternative will ameliorate vibration effects both on Factory Street and on Mill Street. The defendants calculated that the FSU alternative would result in "vibration magnitudes at the residences on Factory Street and Market Street which are less than existing vibration magnitudes." They reached this conclusion by

20

noting that the new underpass increases the current pavement surface area by 58%. Since vibration energy is dissipated through pavement, the increase in traffic presumably would be countered by the increased (and sunken) surface area of the underpass's pavement.

The Means Report compares the vibration effects on Mill and Factory Streets under current and future plans. The Report points out that the current level of vibration on Mill Street "threatens the long-term life of the historic commercial structures that line the downtown's central artery" and that the reduced vibration on Mill Street under the FSU alternative makes "redeveloping second story space" along Mill Street "more attractive." It also concludes that PennDoT's vibration studies "do not indicate a significant deterioration in terms of livability near the cut-and-cover underpass." The record thus suggests that the FSU alternative will better ameliorate the impacts of vibration on the Historic District.

4. Historic Structures to be Destroyed

The plaintiffs strongly object to the fact that the defendants calculated the square footage of the two historic structures to be relocated or destroyed (one under the FSU alternative and one under the MS alternative) and compared the footage when arguing that the FSU alternative was preferable. The structure to be taken under the FSU alternative covers .1 acre, whereas the structure to be taken under the MS alternative covers .3 acres. The defendants submit that it is better to take a smaller structure than a larger one. Case law teaches that the evaluation of harm requires a far more subtle calculation than merely totaling the number of acres affected. See District of Columbia Fed'n of Civic Ass'ns v. Volpe, 459 F.2d 1231, 1239 (D.C. Cir. 1971). Nevertheless, the plaintiffs do not indicate why the smaller structure is the more historically significant (though it is their burden to show that the defendants' decision was arbitrary and capricious), and the record discussion of the two buildings in the FEIS does not indicate that they differ significantly in historical worth.

21

The FEIS describes 2-4 Front Street, the historic structure that would be taken under the MS alternative, as a multi-family residential structure. The FEIS states, "The two story frame dwelling which dates from the late 19th century is in good condition, but has fair historical integrity due to the application of aluminum siding." The FEIS describes 9 Factory Street (which would be destroyed under the FSU alternative) as a two story dwelling with the rear dating from c. 1857 and the front from the late 19th century; the statement describes No. 9 as "fair in both condition and integrity." Although it would have been helpful for the record to contain more detailed historical evaluations, we cannot hold that 9 Factory Street is of such different historical value that it was arbitrary for the defendants to select the alternative that would require No. 9 to be taken.

5. The Means Report

Finally, plaintiffs allege that the Means Report, which concluded that the FSU alternative was the preferred choice, was excessively concerned with the economic benefits that Mill Street businesses would reap under the FSU alternative. They imply that this focus on economics prevented an unbiased analysis of the historic harm that the FSU alternative would inflict on the Factory Street area. In support of their argument, the plaintiffs point to language in the Means Report stating that "from a long-term economic vitality perspective, [the FSU Alternative] is the better of the two PennDoT configurations under active consideration." The plaintiffs contrast that conclusion with an acknowledgment in the Means Report that "if the Factory Street cut-and-cover alternative is built, not only does it do irreparable damage to the traditional skeleton of this remarkably intact 19th century town, it is highly probable that it will foreclose any hope of a bypass." From these two sentences, the plaintiffs argue that the Means Report acknowledged the serious damage the FSU alternative would have on the Historic District but

22

permitted the favorable economics of the FSU alternative to trump those historic concerns.10

While these points weigh in the balance, what is dispositive is that the Means Report concluded that "the Factory Street cut-and-cover will have the lesser negative impact on the town's economic vitality and the overall community character of the Historic District." (emphasis added). The Means Report, which we find to be thorough and sensitive, by no means ignored the impact of each alternative on the historic properties.

6. Affirmative Reasons for Selecting the FSU Alternative

In addition to considering the FSU alternative's drawbacks, the defendants laid out in the administrative record a number of affirmative reasons why the FSU alternative will inflict less harm on the Historic District. First, the defendants concluded that the FSU alternative will physically and visually separate traffic from the Historic

_____

10. While we need not decide whether the economic perspective is permissible, the notion that economic vitality will keep the historic character of Mill Street intact (whereas ignoring the economic health of the district might lead to further disintegration of Mill Street) might well be a relevant factor under the NHPA in a situation like this, where the economic and historic health of Mill Street are so tightly linked. Indeed, revitalizing the economic health of Mill Street was one of the stated purposes of the project. Mill Street merchants and professionals, who are dedicated to restoring the historic architecture on Mill Street, see supra at Part I, have formed the Danville Revitalization Corporation ("DRC"), which is committed to making capital investments in the physical appearance of Mill Street buildings and facades. Between 1993 and 1996, the DRC contributed financially to twenty projects involving storefront, signage, and facade improvements. The merchants formed the DRC partly because the future success of the Mill Street business district turns on the district's ability to present a "pleasant, small town, main street environment in an historic architectural setting." They believe that the best way for Danville to achieve that kind of setting is by reducing traffic on Mill Street. It thus may be true that it is in both the historic and economic interests of Danville to reduce traffic on Mill Street and to protect the historic architecture that lines the street. However, as noted above, we need not decide the appropriateness of the economic perspective in this case.

District, especially on Factory and West Market Streets. This traffic currently runs the length of the Historic District on Mill Street. Under the No-Build and MS alternatives, cars would continue to use West Market and Factory Streets as a way to avoid the heavy traffic on Mill Street. Therefore, even under the MS alternative, Factory Street would not be free from traffic. The FSU alternative would thus better manage traffic by limiting the number of cars using Market Street and taking traffic underground for a fair part of its trip through Danville.

Second, the defendants emphasize that the FSU Alternative will greatly reduce the crippling traffic on Mill Street, an area that is as much a part of Danville's Historic District as Factory Street is. The Means Report discusses the impact of Mill Street traffic as "contributing to buildings' physical decay," and "threaten[ing] the long-term life of the historic commercial structures that line" Mill Street. Ninety people currently live on Mill Street, and one of the goals of the project is to "restore the residential component of the Mill Street neighborhood." In balancing the harms and benefits of the various alternatives, the defendants justifiably concluded that the FSU alternative would do much good for Mill Street on an historic level.

7. Conclusion

For all of the foregoing reasons, the administrative record supports the FHWA's finding that the FSU alternative will minimize harm to the Danville Historic District. Even if we were to conclude that the MS and FSU alternatives would impose a comparable amount of harm to Danville's Historic District, we would be bound to uphold the Secretary's decision. These decisions are vested by law not in unelected judges but in the accountable Secretary. See Druid Hills, 772 F.2d at 716 ("The Secretary is free to choose among alternatives which cause substantially equal damage to parks or historic sites."). The defendants performed a large number of studies on the various ways in which the alternatives would impact the Historic District and adequately weighed the results of the studies in selecting the preferred alternative. They also considered the more intangible benefits and harms to Mill and Factory Streets

24

under the competing alternatives. As the foregoing discussion demonstrates, they considered and responded to the comments of the ACHP. Therefore, they did not violate Section 106. And as that discussion also demonstrates, it was not arbitrary and capricious for the FHWA to select the FSU alternative under Section 4(f)(2).

D. The MS&B Alternative

The plaintiffs' final argument under Section 4(f)(2) is that the defendants violated the statute in designating the MS&B alternative "imprudent" and thus arbitrarily failing to consider the MS&B alternative in detail in the FEIS as a possible 4(f)(2) "least harm" alternative.

Courts have held that an alternative that minimizes harm under Section 4(f)(2) can still be rejected if that alternative is infeasible or imprudent. See Hickory Neighborhood Defense League v. Skinner, 893 F.2d 58, 62 (4th Cir. 1990) (Hickory I) (acknowledging that Section 4(f)(2) contains an implied "feasible and prudent" test); Druid Hills, 772 F.2d at 716; Louisiana Envtl. Soc'y, Inc. v. Coleman, 537 F.2d 79, 86 (5th Cir. 1976) (same). While the Supreme Court has articulated what "infeasible or imprudent" means in the 4(f)(1) context, it has not spoken to what those terms mean in the 4(f)(2) context. Under Section 4(f)(1), an alternative is not a prudent alternative if there are truly unusual factors present, if the cost or community disruption resulting from the alternative reaches extraordinary magnitudes, or if the alternative presents unique problems. See Overton Park, 401 U.S. at 413. We believe that we should apply a similar "feasible and prudent" determination to the world of alternatives that must be considered under 4(f)(2). See Louisiana Envtl. Soc'y, 537 F.2d at 86 ("Although there is no express feasible and prudent exception to subsection (2), the act clearly implies that one is present.").

We note in this regard that 4(f)(1) sets a very high standard for excluding alternatives that do not use historically significant property, since Congress has determined that the use of such property should be avoided wherever possible. The standard under 4(f)(2) for eliminating alternatives need not be quite so high, since by

25

the time 4(f)(2) is reached, some historically significant property will necessarily be used, as is the case here. We therefore hold that the Secretary must consider every "feasible and prudent" alternative that uses historically significant land when deciding which alternative will minimize harm, but that the Secretary has slightly greater leeway--compared to a 4(f)(1) inquiry--in using its expertise as a federal agency to decide what the world of feasible and prudent alternatives should be under 4(f)(2). We also look for guidance to caselaw examining what "infeasible or imprudent" means in the 4(f)(1) context.

The plaintiffs argue that the MS&B alternative, which would require defendants to build another bridge upstream to siphon off "through" traffic that now passes through Danville on its way to a remote location, would minimize the harm to the Historic District by leaving Factory Street intact while reducing Mill Street congestion. They also point out that the Means Report concluded, "Ideally, and most leaders we discussed it with agree, a bypass is the answer."

The defendants rejected the MS&B option without performing an in-depth analysis of it because they concluded the option was imprudent and thus undeserving of inclusion in the balancing-of-harms test mandated by Druid Hills. In the FEIS, the defendants offered four reasons why they had not evaluated MS&B thoroughly and why they had deemed the MS&B alternative imprudent and infeasible.

First, the defendants performed a study that asked drivers who used the Danville-Riverside Bridge whether they would use an upstream bypass. The 50% response rate resulted in 3,500 completed surveys, which the defendants felt was a sufficient sample size. Only 25% of the respondents indicated that they would use a bypass. The plaintiffs rejoin that most of the responses came from local traffic, so that the results were skewed downwards, though it is not clear in the record that most of the respondents were traveling locally. A 809 (charting purpose of respondent's trip but not destination).[11] A determination

_____

11. The plaintiffs are concerned that the proportion of tractor-trailer responses (which comprised 2% of the total responses) is not

26

that 75% of traffic would continue to use the Danville-Riverside Bridge calls into serious question the usefulness of the bypass alternative in drawing traffic away from Danville. See, e.g., Hickory Neighborhood Defense League v. Skinner, 910 F.2d 159, 164 (4th Cir. 1990) (Hickory II) (Secretary may reject as imprudent alternatives that will not solve or reduce existing traffic problems).

Second, the defendants cited the cost of the project as high enough to render the MS&B alternative imprudent. The defendants believed that, for financial reasons, only one structure could be built, and that building a bypass upstream would foreclose the most important part of the project, which was to replace the Danville-Riverside Bridge. They stated, "There is not, at this time, funding allocated and programming scheduled to allow the study and construction of a bypass bridge." While no cost studies were performed on the MS&B alternative, it is reasonable to assume that the costs required to build not only another bridge but also to lay over a mile of roadway and to cover condemnation, litigation, planning, engineering, and building costs for that roadway might total many times what would be required to rebuild the Danville-Riverside Bridge. Overton Park held that an agency may not exclude an alternative as imprudent under 4(f)(1) based on cost unless the costs would be of "extraordinary magnitudes." 401 U.S. at 413. Here, it appears that the costs of an additional bridge would meet the definition of "extraordinary."

Third, the defendants highlighted the impact of the additional construction that would be necessary to build the MS&B alternative. The MS&B alternative would require that two bridges be built instead of one, and that an

_____

representative of the makeup of current bridge traffic. Plaintiffs calculate
that trucks actually account for 12.5% of all bridge traffic. Nevertheless,
even if we assume that there were additional responses by truck drivers
such that the proportion of trucks in the survey was 12.5%, and that
each of the additional responses stated that the truck driver would use
the bypass, the survey would have demonstrated that only 33% of
current bridge users would choose the bypass. We believe that a 33%
predicted use rate still calls into question the usefulness of the bypass
alternative.

27

additional 5,500 feet of road be laid, forcing construction
that would impact the environment and communities near
the second bridge site. Fourth, the defendants argued that
there was no need for a bypass, as the FSU or MS
alternative could fill the project needs on its own.

Even if the cost increases would not be extraordinary, the
problematic results of the use survey and the community
and environmental disruption that would result from the
additional construction combine to suggest that the MS&B
alternative was neither prudent nor feasible. In the 4(f)(1)
context, courts have held that an accumulation of smaller
problems that, standing alone, would not individually
constitute unique problems may together comprise
sufficient reason for rejecting an alternative as imprudent.
See Committee to Preserve Boomer Lake Park v. Department
of Transp., 4 F.3d 1543, 1550 (10th Cir. 1993) ("Although
none of these factors alone is clearly sufficient justification
to reject the alternatives in this case, their cumulative
weight is sufficient to support the Secretary's decision.");
Hickory II, 910 F.2d at 163 (holding that a cumulation of
problems may be sufficient reason to reject an alternative
as imprudent); Eagle Found., Inc. v. Dole, 813 F.2d 798,
805 (7th Cir. 1987) (same).

In sum, we cannot conclude that it was arbitrary to reject
this alternative in view of the low predicted use rate, the
impact of the added construction, and the enormously
increased costs, all of which, taken together, make the
MS&B alternative imprudent for minimizing harm under
4(f)(2). We therefore hold that the defendants did not violate
the requirements of Section 4(f) by failing to consider the
MS&B alternative in greater detail.

E. NEPA

While 4(f)(2) ensures that the Secretary puts his thumb
on the scales in favor of protecting historic properties,
NEPA, 42 U.S.C. S 4321 et seq., governs the procedures
surrounding the requisite balancing. Under NEPA,
Congress directed all agencies of the federal government to

> include in every recommendation or report on
> proposals for legislation and other major Federal

28

actions significantly affecting the quality of the human
environment, a detailed statement by the responsible
official on--

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot
be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of
man's environment and the maintenance and
enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of
resources which would be involved in the proposed
action should it be implemented.

Prior to making any detailed statement, the responsible
Federal official shall consult with and obtain the
comments of any Federal agency which has jurisdiction
by law or special expertise with respect to any
environmental impact involved.

Id. S 4332(2)(C).

The agency must also "study, develop, and describe
appropriate alternatives to recommended courses of action
in any proposal which involves unresolved conflicts
concerning alternative uses of available resources .. . ." Id.
S 4332(2)(E). The detailed statement, known as an
Environmental Impact Statement ("EIS"), is the device that
promotes the fulfillment of NEPA's goal, which is to "control
the more destructive effects of man's technology on his
environment." Township of Springfield v. Lewis, 702 F.2d
426, 429 (3d Cir. 1983) (citation omitted).

The way in which NEPA achieves that goal is a
procedural one. NEPA ensures that an agency has before it
detailed information on significant environmental impacts
when it makes its decisions and guarantees that this
information is available to a larger audience. See Inland
Empire Pub. Lands Council v. United States Forest Serv., 88
F.3d 754, 758 (9th Cir. 1996). "NEPA exists to ensure a
process, not to ensure any result." Id. ; see also Baltimore
Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,

29

462 U.S. 87, 97 (1983) (NEPA requires an agency to take a "hard look" at the potential environmental consequences of proposed projects before taking action); Laguna Greenbelt, Inc. v. United States Dep't of Transp., 42 F.3d 517, 523 (9th Cir. 1994) (NEPA does not mandate particular substantive results, but instead imposes only procedural requirements).

Under NEPA, an agency decision "to go forward with a major federal action after the agency has prepared and considered an Environmental Impact Statement, requires the court to determine whether all necessary procedures were followed, to consider de novo all relevant questions of law, and to examine the facts to determine whether the decision was arbitrary, capricious, and an abuse of discretion." See Concord Township v. United States, 625 F.2d 1068, 1073 (3d Cir. 1980); see also Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 376-77 (1989) (stating that courts are to review factual disputes that implicate substantial agency expertise under the arbitrary and capricious standard). We make "a pragmatic judgment whether the [EIS's] form, content and preparation foster both informed decision-making and informed public participation," and "[o]nce satisfied that a proposing agency has taken a `hard look' at a decision's environmental consequences, [our] review is at an end." City of Carmel-by-the-Sea v. United States Dep't of Transp., 123 F.3d 1142, 1150-51 (9th Cir. 1997) (citations omitted).

The plaintiffs contend that the EIS was inadequate because it failed to consider the MS&B alternative, and that the FHWA therefore violated NEPA. Specifically, the plaintiffs allege that the FHWA only considered the Bypass alternative as a stand-alone alternative--rather than considering it in conjunction with the MS alternative--and therefore rejected the bypass as not meeting the primary purpose of the bridge replacement project. As discussed above, the plaintiffs believe that the combined MS&B alternative would most successfully achieve the goals of the project: to replace the bridge and to limit the traffic volume on Mill Street. To the extent that FHWA did consider the MS&B alternative, the plaintiffs argue, FHWA rejected it on the ground that funding was not available for both a new bridge and a bypass, and the plaintiffs allege that lack of

present funding is an improper reason to reject a viable alternative.

The defendants respond that they considered the MS&B alternative in the DEIS and FEIS and rejected it as an unreasonable alternative for the four reasons it rejected the alternative under Section 4(f)(2): the origin and destination study indicated that the great majority of traffic would continue to use the Danville-Riverside Bridge rather than the bypass; it would vastly increase the scope and construction costs of the project; the FSU alternative alone would satisfy the needs of the project; and it would cause greater social and environmental impacts than the MS or FSU alternative would on its own.

NEPA requires the defendants to consider only "reasonable" alternatives in the EIS. See Presidio Golf Club v. National Park Serv., 155 F.3d 1153, 1160 (9th Cir. 1998) (holding that agency must look at "every reasonable alternative" but "set forth only those alternatives necessary to permit a reasoned choice"); Druid Hills, 772 F.2d at 713 (stating that the EIS should "go beyond mere assertions" and should devote substantial treatment to "all reasonable alternatives"). A number of courts recently have addressed the extent to which federal agencies must consider alternatives under NEPA. These courts have concluded that where the agency has examined a breadth of alternatives but has excluded from consideration alternatives that would not meet the goals of the project, the agency has satisfied NEPA. See, e.g., Morongo Band of Mission Indians v. Federal Aviation Administration, 161 F.3d 569, 575-76 (9th Cir. 1998) (upholding the defendants' consideration of alternatives under NEPA as sufficient to permit a reasoned choice); Friends of the Boundary Waters Wilderness v. Dombeck, 164 F.3d 1115, 1129 (8th Cir. 1999) (upholding agency's decision where the FEIS had considered ten alternative plans of action based on visitor levels and effects of visitor use, eliminated two alternatives that were deemed impractical for failing to meet the goals of the project, and adequately explained why increased visitor use was not a viable goal).

In the instant case, the defendants sufficiently explained why the MS&B alternative was not feasible and why it did

31

not warrant a highly detailed examination. The plaintiffs' argument that the MS&B alternative possibly could help achieve the two project goals of replacing the bridge and reducing Mill Street congestion encounters the same responses that the FHWA offered under Section 4(f): low use rate and excessive construction and environmental costs. In addition, in arguing for the MS&B alternative, the plaintiffs have not offered a "specific, detailed counterproposal that had a chance of success." See City of Angoon v. Hodel, 803 F.2d 1016, 1022 (9th Cir. 1986); Friends of the Earth v. Coleman, 513 F.2d 295, 298 (9th Cir. 1975) (holding that EIS did not have to consider alternative sites where plaintiffs failed to allege specific evidentiary facts showing that the alternative sites were reasonable and viable).

In Druid Hills, the court concluded, "Although the EIS does not contain what some may feel is a detailed and careful analysis of the relative environmental merits and demerits of the proposed action and possible alternatives, we find no sufficient basis in the record to disturb the district court's conclusion that appellees adequately analyzed the alternatives." Id. at 713; see also City of Carmel, 123 F.3d at 1151 (upholding a "reasonably thorough" FEIS). There is necessarily a limit to the thoroughness with which an agency can analyze every option, see Morongo Band, 161 F.3d at 575 (noting that, without parameters and criteria, an agency could generate countless alternatives), and our standard of review is quite deferential, see Corridor H Alternatives, Inc. v. Slater, 166 F.3d 368, 374 (D.C. Cir. 1999). We conclude that the defendants adequately considered the MS&B alternative and its attendant flaws before rejecting it as infeasible. We therefore will affirm the District Court's grant of summary judgment for the defendants on the NEPA issue as well.

The judgment of the District Court will be affirmed.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

32