

Opinions of the United
States Court of Appeals
for the Third Circuit

5-31-2001

# Friends of Atglen v. Surface Trans. Board

Precedential or Non-Precedential:

Docket 99-5837

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Friends of Atglen v. Surface Trans. Board" (2001). *2001 Decisions.* Paper 120.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/120

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 31, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-5837

FRIENDS OF THE ATGLEN-SUSQUEHANNA TRAIL, INC.,

     Petitioner

v.

SURFACE TRANSPORTATION BOARD and
UNITED STATES OF AMERICA,

     Respondents

On Petition for Review of an Order
of the Surface Transportation Boar d
(No. AB-167 1095X)

Argued September 12, 2000

Before: NYGAARD, ROTH and BARRY, Circuit Judges

(Opinion filed: May 31, 2001)

       Andrea C. Ferster, Esquire (Ar gued)
       1100 Seventeenth Street, N.W.,
        10th Floor
       Washington, D. C. 20036

       Charles Montange, Esquire
       426 N.W. 162nd Street
       Seattle, WA 98177

        Attorneys for Petitioner

Ellen D. Hanson, General Counsel
Louis Mackall, V. Attorney (Argued)
Surface Transportation Board
Washington, D.C. 20423-0001

M. Alice Thurston, Esquire
John T. Stahr, Esquire
United States Department of Justice
P.O. Box 23795
L'Enfant Plaza Station
Washington, D.C. 20026

 Attorneys for Respondent

Paul D. Keenan, Esquire
Hoyle, Morris & Kerr
1650 Market Street
4900 One Liberty Place
Philadelphia, PA 19103

 Attorney for Intervenor Respondent

OPINION OF THE COURT

ROTH, Circuit Judge:

The Enola Branch is a 66.5 mile railroad line which was built in the early Twentieth Century and was known as one of the remarkable engineering feats of that time. Petitioner, Friends of the Atglen-Susquehana Trail, Inc. (FAST), seeks judicial review of a final order of the Surface Transportation Board (STB)1 permitting abandonment of the Enola Branch.

_____

1. The STB is the federal agency having exclusive jurisdiction over transportation by railroad. See 49 U.S.C. S 10501(a)(1). The STB is the successor agency to the Interstate Commerce Commission (ICC), which was abolished by Congress in 1995. See ICC Termination Act of 1995, S 101, P.L. 104-88, 109 Stat. 804, 49 U.S.C. S 701 note (1995). That act also established the STB, see 49 U.S.C.S 701, and provided that it would perform all the functions that pr eviously were performed by the ICC as of the effective date of the act. See 49 U.S.C. S 702; see also ICC Termination Act of 1995, S 204, P .L. 104-88, 109 Stat. 804, 49 U.S.C. S 701 note.

In this opinion, we will refer to the agency as the ICC before its abolition and as the STB afterwards.

2

FAST challenges the manner in which the STB carried out its responsibilities under S 106 of the National Historic Preservation Act (NHPA), 16 U.S.C. S 470f. In particular, FAST objects to the manner in which the STB identified and protected historic properties along the line, to the STB's failure to consider evidence that the corridor as a whole was entitled to protection as a historic pr operty, and to the manner in which the STB terminated consultation on a plan to protect historically eligible pr operty. For the reasons that follow, we will vacate the STB's decision and r emand this matter to it for further consideration.

I. REGULATORY BACKGROUND

A. ABANDONMENT OF RAIL LINES

FAST seeks review of the actions of the STB in the exercise of its exclusive regulatory jurisdiction over rail carriers and rail transportation, particularly its jurisdiction to permit a rail carrier to abandon or discontinue use of an existing rail line that might qualify as or contain historic property. We begin, therefor e, with an overview of the relevant regulatory landscape.

A rail carrier intending to abandon, and to be r eleased from its obligations to retain or operate, any part of its railroad lines must file an application to do so with the STB and such abandonment must adhere to certain established procedures. See 49 U.S.C. S 10903(a)(1)(A); see also 49 U.S.C. SS 10903–10907. The STB is empower ed to exempt a transaction from the ordinary regulatory requirements if the STB finds that the ordinary procedur es are not necessary to carry out federal transportation policy and that either the transaction is limited in scope or the full application procedures are not necessary to protect shippers from any abuses of market power . See 49 U.S.C. S 10502(a).

The abandonment of a rail line or corridor will qualify as an exempt transaction if the carrier certifies that no local traffic has moved over the line for at least two years, that any traffic on the line can be rerouted over other lines, and that no formal complaints, regarding cessation of service on

3

the line, are pending or have been decided within that two-year period. See 49 C.F.R. S 1152.50(b). This process is intended to be an expedited one. The exemption, and therefore permission to abandon the rail line, becomes effective 30 days after publication of notice in the Federal Register. See 49 C.F.R. 1152.50(d)(3); see also 49 U.S.C. S 10502(b) ("Any proceeding begun as a result of an application under this subsection shall be completed within 9 months after it is begun."). An exempt abandonment remains subject to any conditions that the STB may impose upon it.

If the STB agrees that a proposed abandonment is exempt and allows the abandonment to proceed under the expedited procedures, the STB must consider certain factors prior to permitting the abandonment to become final. See 49 C.F.R. S 1152.50(a)(2). First, the STB must consider and determine whether the rail pr operties to be abandoned are appropriate for use for public purposes. See 49 U.S.C. S 10905;2 49 C.F .R. S 1152.28(a)(1). If the STB finds that the properties are appr opriate for public use, the STB is authorized to impose conditions on the abandonment of the property by the carrier . Such conditions may include a prohibition on the disposal of the property for a period of 180 days unless the pr operty is first offered, on reasonable terms, for sale for public purposes. See 49 U.S.C. S 10905; 49 C.F.R. S 1152.28(d). Second, the STB must consider possible interim trail use or rail banking,3 should any state, political subdivision, or qualified private organization be interested in acquiring or using the rail line right-of-way in such a manner. See 16 U.S.C. S 1247(d); 49 C.F.R. S 1152.29. Third, the STB must comply with the requirements of S 106 of the National Historic Preservation Act, 16 U.S.C. S 470f.

The exemption procedures of S 10502 and S 1152.50 are intended to expedite the approval of the pr oposed abandonment by making it effective almost immediately,

_____

2. Formerly 49 U.S.C. S 10906.

3. This would permit the railroad right-of-way to be used in some interim manner and to be preserved for future r estoration or reconstruction and reactivation for railroad purposes. See 49 U.S.C. S 1247(d).

4

subject to any conditions imposed by the STB. Consideration of the S 106 historic pr eservation process, on the other hand, necessarily requires the STB to proceed more slowly. The fact that Congress has introduced a procedure which permits the slowing of the overall abandonment process reflects Congr ess's intent to balance immediate, fast-track approval of the abandonment by the carrier with a more deliberate consideration of preservation of historically significant properties. See Concerned Citizens Alliance, Inc. v. Slater, 176 F.3d 686, 695-96 (3d Cir. 1999) (citing Illinois Commerce Comm'n v. ICC , 848 F.2d 1246, 1260-61 (D.C. Cir. 1988) (describing S 106 as "stop, look, and listen" provision requiring an agency to acquire information before acting)).

B. HISTORIC PRESERVATION

Section 106 of the NHPA provides as follows:

> The head of any Federal agency having dir ect or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register.

16 U.S.C. S 470f. The NHPA is a pr ocedural statute designed to ensure that, as part of the planning process for properties under the jurisdiction of a federal agency, the agency takes into account any adverse effects on historical places from actions concerning that pr operty. See Morris County Trust for Historical Preservation v. Pierce, 714 F.2d 271, 278-79 (3d Cir. 1983). The STB, as a federal agency, must adhere to S 106 in considering and approving exemption or abandonment of a rail line. See 36 C.F.R. S 800.2(a).

The Advisory Council on Historic Preservation (ACHP) has promulgated regulations outlining the pr ocedures to be

followed by an agency in satisfying its responsibilities under S 106, codified at 36 C.F.R. Part 800. See Morris County Trust, 714 F.2d at 280 ("[T]he Advisory Council's regulations are particularly persuasive concerning the proper interpretation of NHPA.") An agency is expected to consult with various interested parties thr oughout the S 106 process, including the State Historical Preservation Officer (SHPO), who is the state official appointed or designated, pursuant to S 101(b)(1) of the NHP A, 16 U.S.C. S 470a(b)(1), to administer the state historic preservation program. See 36 C.F.R. S 800.16(v); see also 16 U.S.C. S 470a(b)(3) (establishing the responsibilities of the SHPO). The agency, in consultation with the SHPO, must also involve the public in the process, see 36 C.F.R. S 800.3(e), and identify other parties that should be invited to participate in the process as consulting parties, including local governments and those parties that r equest to participate in the process. See 36 C.F .R. S 800.3(f)(1-3). The ACHP itself must be afforded a "r easonable opportunity to comment on such undertakings." 16 U.S.C. S 470f; 36 C.F.R. S 800.1(a); see also Concer ned Citizens, 176 F.3d at 695 (holding that the Council's comments must be taken into account and integrated into the decisionmaking process).

The ACHP regulations establish a three-step process: identification of historic properties; assessment of any adverse effects of the proposed undertaking on such properties; and creation of a plan to avoid, minimize, or mitigate those adverse effects. See 36 C.F.R. S 800.1(a). The agency, in consultation with the SHPO and other interested parties, may address multiple steps in one consultation as long as all parties are given an adequate opportunity to comment. See 36 C.F.R. S 800.3(g).

In order to identify historic properties, the agency must apply the criteria established for the National Register of Historic Places (National Register) to identify pr operties and to determine whether they would be eligible for the National Register. See 36 C.F.R. S 800.4(c)(1). Significantly, the regulations provide that the "passage of time, changing perceptions of significance, or incomplete prior evaluations may require the Agency Official to r eevaluate properties

6

previously determined eligible or ineligible." 36 C.F.R.
S 800.4(c)(1).

If the agency and the SHPO agree that the criteria for the
National Register have been met, the property or portion
thereof shall be considered eligible for the National Register
for S 106 purposes. See 36 C.F .R. S 800.4(c)(2). If the
agency and the SHPO agree that the criteria have not been
met, the property is considered ineligible. See id. If the
agency and the SHPO do not agree, or if the ACHP or the
Secretary of the Interior so requests, the agency "shall"
obtain a determination from the Secr etary, acting through
the Keeper of the National Register (Keeper), as to the
historic eligibility of the property. See id. Other courts of
appeals have held that this determination by the Secretary
or the Keeper should be conclusive. See Moody Hill Farms
Ltd. Partnership v. United States Department of the Interior,
205 F.3d 554, 558 (2d Cir. 1999) (describing the
independent authority of the Keeper, on behalf of the
Secretary, to determine whether a pr operty should be listed
as historic); Stop H-3 Ass'n v. Coleman, 533 F.2d 434, 441
n.13 (9th Cir.) (noting that the Secr etary's opinion as to the
historic eligibility of property is conclusive).

If the agency finds that there are no historic properties
that will be affected by the undertaking, the agency must
document its findings and provide such documentation to
the ACHP, the SHPO, and other consulting parties. The
SHPO and the ACHP have 30 days to object to thatfinding;
otherwise, the agency's S 106 responsibilities are deemed
completed. See 36 C.F.R. S 800.4(d)(1). If the agency finds
that there are historic properties that may be affected, the
agency must notify all consulting parties and invite their
views on the effects of the proposed undertaking and their
assessments of any adverse effects. See  36 C.F.R.
S 800.4(d)(2).

An adverse effect is found when the undertaking may
alter, directly or indirectly, any of the characteristics that
make a property historic and eligible for inclusion in the
National Register. See 36 C.F .R. SS 800.5(a)(1), 800.16(i).
Such adverse effects include physical destruction of or
damage to all or part of the property, alteration of the
property, removal of property fr om its historic location, or

7

a change in the character of the property's use. See 36 C.F.R. S 800.5(a)(2). The regulations establish the steps that an agency must take in determining whether or not there are adverse effects and in notifying interested parties of its findings. See 36 C.F.R. S 800.5. However, agencies, as did the STB here, will often assume the occurr ence of adverse effects to properties identified as historic. Once the agency finds (or assumes) the existence of adverse ef fects, the agency must continue consulting with the parties in order to resolve such adverse effects and to develop and evaluate alternatives or modifications to the undertaking that will avoid, minimize, or mitigate such effects. See 36 C.F.R. SS 800.5(d)(2), 800.6(a). The agency must also notify the ACHP of the adverse effect finding and pr ovide certain specified documentation. See 36 C.F .R. S 800.6(a)(1).

The process then moves to the third andfinal step, the resolution of adverse effects and the development of a plan to avoid, minimize, or mitigate the adverse ef fects. At this stage, the SHPO and any other consulting parties may invite the ACHP to participate in the consultation; under certain circumstances, the ACHP must be invited to participate. See 36 C.F.R. SS 800.6(a)(1)(i), (ii). The agency and the other consulting parties may also agr ee to invite new parties to consult. They are requir ed to invite any organization that will play a specific r ole or assume special responsibility in any mitigation plan. See  36 C.F.R. S 800.6(a)(2).

The ACHP has discretion at this stage to decide if it will consult formally. See 36 C.F.R.S 800.6(a)(1)(iii); see also 36 C.F.R. Part 800 App. A (setting forth criteria that the ACHP uses to determine whether formally to enter a particular S 106 review). Its decision deter mines how the agency must proceed. If the ACHP chooses not to join the consultation formally, section 800.6(b)(1) of the ACHP r egulations controls. The agency consults with the SHPO and other consulting parties in devising a plan to avoid or mitigate the adverse effects. If the agency and the SHPO agree on a plan, they execute a Memorandum of Agreement (MOA), a copy of which must be submitted to the ACHP for its comments prior to the agency approving the undertaking. See 36 C.F.R. S 800.6(b)(1)(iv); see also 36 C.F.R.

8

S 800.6(c)(1)(i). An executed MOA evidences the agency's compliance with S 106 of the NHPA and governs the carrying out of the federal undertaking. See 36 C.F.R. S 800.6(c). If the agency and the SHPO fail to agree on a plan, the agency must ask the ACHP formally to join the consultation. See 36 C.F.R. S 800.6(b)(1)(v). If the ACHP again declines to consult formally, it must pr ovide comments on the undertaking and on the status of the S 106 review, which the agency must consider in reaching any final decision as to mitigation. See 36 C.F.R. S 800.6(b)(1)(v); see also 36 C.F .R. S 800.7(c).

If, at any point, the ACHP formally joins the consultation on mitigation, section 800.6(b)(2) controls. The ACHP must execute the MOA along with the agency, the SHPO, and any other consulting parties. See 36 C.F .R. S 800.6(b)(2); see also 36 C.F.R. S 800.6(c)(1)(ii). Any party that assumes a responsibility in carrying out the MOA may also be asked to be a signatory to the MOA. See 36 C.F .R. S 800.6(c)(2)(ii).

If, at any point during consultation, the agency, the SHPO, or the ACHP determines that further consultation will not be productive, any of them may, upon notice to the other consulting parties, terminate consultation. See 36 C.F.R. S 800.7(a). If the agency ter minates the consultation, it must request and receive comment fr om the ACHP. See 36 C.F.R. S 800.7(a)(1).

Comments from the ACHP are governed by S 800.7(c). The ACHP has 45 days from receipt of a r equest to provide comments on an agency's termination of mitigation consultation, pursuant to S 800.7(a)(1), or on an agency's statement that it is unable to reach an MOA thr ough consultation with the SHPO alone, pursuant to S 800.6(b)(1)(v). See 36 C.F.R.S 800.7(c)(2). The agency must take these comments into account in reaching a final decision on the undertaking, see 36 C.F .R. S 800.7(c)(4), and the agency is required to document that it did so by explaining its decision and providing evidence that it considered the ACHP's comments. See 36 C.F.R. S 800.7(c)(4)(i); see also Concerned Citizens, 176 F.3d at 696 (stating that the "relevant agency must demonstrate that it has read and considered" the opinions and recommendations of the ACHP). This decision and

explanation is to be provided to the ACHP , to all consulting parties, and to the public prior to the final appr oval and carrying out of the undertaking. See 36 C.F .R. SS 800.7(c)(4)(i-iii).

## II. FACTS

There is no dispute as to the underlying facts or the course of the regulatory proceedings in this matter. In October 1989, Conrail[4] filed a Notice of Exemption with the ICC, seeking to abandon the Enola Branch, a 66.5-mile rail corridor running through Lancaster and Chester Counties, in Pennsylvania. Conrail certified that no traffic had moved over the line for two years. There is no suggestion that Conrail did not adhere to the filing and notice requirements for seeking an exemption. Lancaster County objected to Conrail's petition, primarily seeking a public use or interim trail use and rail banking condition on the exemption. Although the County did not expressly raise S 106 or seek a historic condition on the abandonment, it did pr ovide the following description of the rail line to the ICC:

> The Enola Branch railroad line itself is a historically significant resource. Pennsylvania Railr oad President A.J. Cassett built the railroad line as a passenger route through Pennsylvania and Ohio in the first decade of this century. It was once a vital east-west fr eight line for southeastern Pennsylvania. The families of Italian laborers constructed the line and now inhabit the Quarryville area. The railroad corridor is designed and constructed to have little slope, so it either cuts into the ground or is elevated over most of its length. The project is known as one of the most remarkable engineering feats of its time. The physical impacts of the corridor on adjacent land owners is negligible. The line is very well designed with the landscape to limit obtrusiveness to the natural character of the ar ea. It is

_____

4. Conrail's assets have been acquired by, and divided between, two railroad operations, Norfolk Souther n Corp. (Norfolk) and CSX Corp. The former Enola Line is now controlled by Norfolk, which intervened in this appeal on behalf of the STB.

said the earth moving involved in the project rivaled
that of the construction of the Panama Canal.

The ICC issued an Order on February 22, 1990 (1990
Order) in which it granted to Conrail the exemption, subject
to three conditions: 1) that Conrail keep intact all the right-
of-way underlying the track, including bridges and culverts,
for a period of 180 days, to allow for the negotiation of a
public use acquisition; 2) that Conrail comply with terms
and conditions for implementing possible interim trail use
and rail banking; and 3) "that Conrail take no steps to alter
the historic integrity of the bridges on the line until
completion of the section 106 process of the National
Historic Preservation Act, 16 U.S.C. S 470." Negotiations
between Conrail and Lancaster County to preserve the line,
either through sale for public use or for interim trail use
and rail banking, proved unsuccessful, despite extensions
well beyond the 180-day period provided for in the 1990
Order. The record indicates that the trail use plan fell
through in part because FAST was unable to act as a
financially responsible party for an interim trail use or to
find a public sponsor, as requir ed under 49 C.F.R.
S 1152.29(a)(2). On April 19, 1993, the ICC denied
Lancaster County's request for a further extension of the
negotiating period, vacated the trail use condition, and
granted Conrail permission to abandon the line (1993
Order).

The remaining condition on abandonment was for the
preservation of historically significant pr operties, pending
STB's completion of the S 106 process. The 1990 Order only
required preservation of the historic integrity of the bridges
on the line. This limitation apparently was based on a 1989
telephone conversation between a member of the ICC's
Section of Environmental Analysis (SEA) and Pennsylvania's
SHPO, the Pennsylvania Historical and Museum
Commission, Bureau for Historic Preservation (PHMC). In
that conversation, the SHPO indicated that some or all of
the 83 bridges on the line potentially were eligible for
inclusion in the National Register but that it had not
completed its review. The 1990 Order did not discuss or
address the comments from Lancaster County about the
historic significance of the line as a whole. The ICC also

11

never sought a determination from the Secretary of the Interior or the Keeper as to the historic eligibility of the line as a whole or of other portions of the rail corridor . The 1990 Order made no final identification of eligible historic properties but limited the scope of possible historic properties to some or all of the bridges on the line, as initially identified by the SHPO in the telephone conversation.

The ICC then followed its common practice of assuming that abandonment of the Enola Branch corridor would adversely affect the rail properties identified as historic, i.e., some or all of the 83 bridges. The ICC therefor e proceeded to the third step in the S 106 pr ocess, development of a plan to avoid, minimize, or mitigate the adverse ef fects. The record does not indicate, however, that the ICC notified the ACHP of the presumptive finding of adverse ef fects.

The final, mitigation stage of the S 106 pr ocess was also a long one. It was complicated by the fact that in April 1996, FAST petitioned the STB to reopen the proceedings and to broaden the S 106 condition to encompass the entire Enola Branch, as the eligible historic property to be preserved. In its petition, FAST r elied on a letter dated February 24, 1994, from Brenda Barr ett, director of the PHMC (the Pennsylvania SHPO), to Wendy T ippetts of an organization known as "TWO."5  In that letter, Barrett stated that, in the opinion of the SHPO, the Enola Branch and the Atglen & Susquehana Branch both were eligible for listing in the National Register. The STB was sent a copy of the letter.

The STB responded to the petition on October 2, 1997 (1997 Order) by ordering that 1) the pr oceeding was reopened, 2) the request by FAST to expand the condition to include the entire Enola Line was denied, and 3) the S 106 condition imposed in 1990 was modified to encompass only 32 bridges on the line and ar chaeological sites near 36 bridges as the properties eligible for listing in

_____

5. At oral argument, counsel for FAST represented that FAST hired Tippetts as consultant in the efforts to preserve the corridor as historic property. Nothing has been presented to us explaining what "TWO" stands for.

the National Register. In explaining its decision to deny FAST's petition to expand the scope of the eligible historic property, the Board stated that

> Neither FAST nor the SHPO has provided any justification for the SHPO's apparently changed position with regard to eligibility of the entire line in the National Register. Indeed, the SHPO letter submitted by FAST does not even acknowledge that the SHPO had ever reached a previous deter mination on this matter. . . . It is clear that the SHPO was originally concerned only with the eligibility of certain bridges and archaeological sites for section 106 purposes. The fact that certain items were included in the SHPO's original opinion while others were excluded indicates that the SHPO did not originally consider the entir e line eligible.6

FAST timely petitioned for reconsideration of the refusal to reopen the proceedings and to expand the identified eligible historic properties. With that petition pending, the parties proceeded along separate tracks. F AST and other interested parties requested that the STB formally submit the question of the historical significance of the Enola Branch line as a whole to the ACHP for referral to the Secretary of the Interior and the Keeper for a conclusive determination. When FAST received no response from the STB, FAST asked the ACHP to become involved in the process. The ACHP wrote to the STB in Mar ch 1998, asserting that the STB never notified the ACHP of its finding of adverse effects, never identified potentially interested parties to consult on the S 106 process, and never informed the ACHP as to how it identified eligible property. The ACHP requested that it be included in the S 106 process and that it be provided background documentation. The STB never responded to this letter.

_____

6. The STB also questioned the applicability of the letter, noting that, although the caption of the letter contained the correct docket number, it referred to a project encompassing additional lines and counties. The STB stated that it "is unclear what this pr oject entails." The STB also noted that any information submitted by F AST in support of the eligibility of the entire line had not been supplied to Conrail or submitted
for entry in the public record.

Meanwhile, the STB proceeded as if the first two steps of the S 106 process, identification of eligible properties and determination of adverse effects, had been concluded and the only remaining step was to devise a plan to mitigate the adverse effects on the bridges and archaeological sites that it had identified as eligible properties. The STB formally consulted with the SHPO and Conrail; the recor d does not indicate that the STB formally invited the ACHP to consult on the mitigation plan. In August 1998, the STB drafted an MOA, memorializing terms that had been agr eed upon by the SHPO, Conrail, and the STB. The plan provided that 1) Conrail would perform recor dation of five identified bridges to State Level Recordation Standards prior to the demolition of those bridges, 2) Conrail would provide funding in excess of $15,000 to the Railroad Museum of Pennsylvania for development of a 6-8 minute video outlining the history of the Enola Branch, 3) Conrail would convey segments of the abandoned line and bridges to local townships and would provide the municipalities with an agreed sum of money for future maintenance of those bridges.

The MOA was submitted to the SHPO and Conrail for execution, to the ACHP for approval, as well as to FAST and the Historic Preservation Trust of Lancaster County (the Trust) for comments. In the transmittal letter to the ACHP, the STB for the first time broached the possibility of breaking off consultation, stating that "[i]f it appears that further consultation would not be productive, we will terminate consultation."

The SHPO declined to sign the MOA, citing the ACHP's concerns that it had not been asked to consult in the development of the MOA; the SHPO withheld further r eview and signature of the plan until the STB had consulted with the ACHP. FAST stated specific objections to the draft MOA, noting FAST's desire to preserve the line and to establish a trail on the corridor. FAST also objected to the manner in which public input had been gathered for the pr oject.

The ACHP, upon receipt of the draft MOA, asserted that the matter of the STB's overall compliance withS 106 "remains unresolved" and that "serious shortcomings persist in STB's evaluation of historic properties, solicitation of public input, evaluation of alter natives, and,

14

development of a mitigation plan." Further , the ACHP discussed the provisions in the S 106 r egulations that provide for reevaluation of determinations of eligibility and for the possible involvement of the Secretary of the Interior. The ACHP concluded that "the eligibility issue r egarding the historic significance of the entire Enola Branch Line will need to be resolved before we can consider the draft MOA." The ACHP stated that only after receiving for mal comments from the Keeper could the ACHP evaluate whether all possible effects had been considered. The ACHP also suggested a meeting among the STB, the SHPO, Conrail, and the ACHP.

In its February 1, 1999, response, the STB described the manner in which it had carried out the identification process and asserted that the identification and effects phases of the S 106 process had been completed and need not be reopened. The STB specifically noted that changed perceptions or evaluations of what is historically significant and therefore eligible for the National Register may indeed justify reevaluation or reopening of pr oceedings but did not necessarily require such a result. Because the STB had found inadequate justification for reopening the identification stage, it continued to decline to do so. The STB solicited anew the ACHP's comments on mitigation and the MOA.

The ACHP, on February 26, 1999, formally referred the matter to the Secretary of the Interior and informed the STB that, pending receipt of the Keeper's findings, it believed that the identification and evaluation r equirements had not been met. The ACHP further asserted that, if the STB continued its efforts to finalize the draft MOA, it would be in violation of its statutory and regulatory obligations. In April 1999, the Keeper issued a determination that the entire 66.5–mile Enola Branch line was eligible for designation in the National Register. The determination stated:

> Constructed by the Pennsylvania Railroad between 1902 and 1906, the entire 66.5 mile Enola Branch Line is eligible for the National Register of Historic Places for its historic and engineering significance. Built as a significant component of the Pennsylvania Railr oad

15

system, the Enola Branch line was an important engineering feat of the early 20th century. The Enola Branch Line differed from other railroads of the period in that it was designed to have no contact with other vehicular routes, and it was to run almost completely level and in a straight line. This straight line, with low radius curves and very little change in grade, pr ovided improved and efficient delivery of fr eight by rail. Building the line necessitated vast amounts of cutting and filling and the construction of numerous stone bridges and culverts built by skilled Italian stone masons.

On August 13, 1999 (1999 Order), the STB denied FAST's petition for reconsideration of the 1997 Or der, holding that FAST had not made the required showing of material error, new evidence, or changed circumstances warranting reconsideration. The Board declined to give substantial weight to the one new piece of evidence, a letter to the Trust from the Curator of Transportation of the National Museum of American History.7 The STB found that the letter could have been presented earlier and noted that the Curator took no formal position in the matter . The STB also declined to reconsider the import of the TWO letter, noting that FAST still had not explained the discr epancy between that letter and the SHPO's formal position on the record before the STB that the only issue remaining in the proceeding was mitigation.8 The STB similarly rejected the Keeper's statement of eligibility, describing it as"pro forma." The STB emphasized that its identification decision had been based on an agreement with the SHPO about the properties to be protected (all of the bridges, later narrowed to 32 bridges and 36 archaeological areas) and that under these circumstances, to restart the identification process to

_____

7. That letter, dated April 2, 1997, detailed the history of the line and called its significance "unquestioned." The Curator stated that he could take "no formal position in such a legal pr oceeding," but he stated that he supported the development of the line, intact, as a recreational and educational trail.

8. The STB emphasized several letters from the SHPO, post-1994, that appear to reflect this same view.

include the entire rail line "would add inexcusable delay to a process that has already taken much too long."

The STB then terminated the consultation pr ocess and removed the S 106 condition, subject only to Conrail's compliance with the terms of the proposed, although unexecuted, MOA. In terminating consultation, the STB emphasized the steps it had taken throughout this process. It found that "further consultation would be fruitless." It further noted the fact that the ACHP would not r espond on the issue of mitigation, despite the STB's r equest for it to do so, and "instead continues to seek to dictate the[STB's] procedures and compel us to reopen this case and declare this entire rail line historic." The STB considered the ACHP's letters in January and February 1999 to be its comments and recommendations on the undertaking and on termination of consultation; having taken them into account, the STB determined that it had complied with S 106 and that the process was complete.

The record indicates that Conrail/Nor folk has consummated abandonment of the rail line, other than the bridges. According to Norfolk, it has been more than ten years since there was activity on the line and more than eight years since there was any railroad equipment or property on the land. All tracks, ties, rails, signage, and equipment have been stripped from the pr operty.

III. JURISDICTION

The STB, as statutory successor to the ICC under the ICC Termination Act, had jurisdiction over Conrail's petition to abandon the Enola Branch and could do so under the exempt procedures. See 49 U.S.C. SS 10501(a)(1)(A), 10502(a)(1), 49 C.F .R. S 1152.50. We have exclusive jurisdiction to review a final or der of the STB, pursuant to 28 U.S.C. SS 2321 and 2342(5), pr ovided that the petition for review was filed by the aggrieved party within 60 days of entry of the final order . See 28 U.S.C. S 2344. FAST filed the instant petition for review within 60 days of service of the Board's 1999 Order .

The STB and intervenor Norfolk did, however , raise two preliminary issues questioning our jurisdiction to review

17

the STB's order and the STB's jurisdiction should this matter be remanded.

A. WHICH ORDER IS BEING REVIEWED?

The STB argues that FAST actually is challenging the 1990 Order that limited the scope of potentially historically eligible properties to the 83 bridges on the rail line. It is the STB's position that direct judicial review of the 1990 Order is precluded by S 2344, which requir es that a petition for review of final agency action be filed within 60 days. See 28 U.S.C. S 2344; see also ICC v. Brotherhood of Locomotive Eng'rs, 482 U.S. 270, 277 (1987). Once that 60-day period has passed, an agency order is no longer subject to judicial review. See id. The STB contends that F AST is precluded from making any arguments that in any way address the manner in which the STB identified historic pr operties or its determination that only some bridges and archaeological areas are eligible for historic pr otection. The STB argues that we have jurisdiction to review only the plan for mitigation as to the bridges and the decision to ter minate consultation. It suggests that we may not addr ess any issues relating to the identification of historic properties.

We disagree and conclude that we do have jurisdiction to review the entire matter, including those aspects of the STB's decisions relating to the identification of eligible historic properties on the rail line. First, in the 1997 Order, the STB rejected FAST's request that the preservation requirement imposed in the 1990 Or der be broadened to apply to the entire Enola Branch line. However , the 1997 Order expressly stated that "[t]his proceeding is reopened." When the STB "reopens a proceeding for any reason and, after reconsideration, issues a new and final order setting forth the rights and obligations of the parties, that order-- even if it merely reaffirms the rights and obligations set forth in the original order--is reviewable on its merits." BLE, 482 U.S. at 278 (citing United States v. Seatrain Lines, Inc., 329 U.S. 424 (1947)). The STB urged that the reopening must be understood in context, that the proceeding was reopened only for the limited purpose of narrowing the scope of the historic condition. However, reopening a proceeding "for any r eason," even if only to

18

reaffirm the original order , gives us jurisdiction to review every aspect of the reopening order . See BLE, 482 U.S. at 278.

Reopening in this case, even if only to narr ow rather than expand the original identification decision, makes the issues of identification reviewable. The STB cannot claim that identification was complete prior to 1997, yet still reopen the proceeding in order to consider some aspect of identification. That further consideration is subject to review, both as to whether it was proper to narrow the scope of the properties to be protected and also as to whether it was improper not to expand the scope of the protected properties. In short, the STB's explicit order to reopen this proceeding meant reopening for all purposes, thereby bringing the issue of identification back into play and making it subject to review at this time.

Second, FAST's 1996 petition (resolved in the 1997 Order), seeking reopening of the pr oceedings for the purpose of reconsidering and expanding the identification decision, was based on a claim of new evidence or changed circumstances, particularly evidence of changed opinions and perceptions of how much of the rail line would be eligible for the National Register. Wher e a motion to reopen is based on non-pretextual arguments about new evidence or changed circumstances, the refusal to r eopen or reconsider a decision itself is reviewable for abuse of discretion. See BLE, 482 U.S. at 284 ("If the petition that was denied sought reopening on the basis of new evidence or changed circumstances review is available and abuse of discretion is the standard."); Fritsch v. ICC, 59 F.3d 248, 252 (D.C. Cir. 1995) (interpreting BLE to permit merits review of a refusal to reopen wher e the motion is based on non-pretextual grounds of new evidence or changed circumstances); Friends of Sierra R.R., Inc. v. ICC, 881 F.2d 663, 666-67 (9th Cir. 1989) ("The or der denying [the] petition is subject to review only if the petition sought reopening on the basis of `new evidence' or`substantially changed circumstances.' "). Even assuming that the STB's 1997 Order declined to reopen for the purposes of expanding the historic condition, that refusal to reopen is itself subject to judicial review. Under BLE, we would have

19

jurisdiction to determine whether the Boar d's refusal to expand the condition was an abuse of discretion.

The STB argues that FAST did not actually submit any new or newly discovered evidence because the opinions of the ACHP, the SHPO, the Keeper, and the Curator, regarding the historic eligibility of the entire line, were available all along and could have been presented earlier. The STB contends, therefore, that F AST actually sought reopening and reconsideration based on"material error," the denial of which motion unquestionably would not be subject to judicial review. See BLE, 482 U.S. at 280 (holding that "where a party petitions an agency for reconsideration on the ground of `material error,' . . . `an order which merely denies rehearing' . . . is not itself reviewable.").

The STB's argument fails because it conflates the jurisdictional and merits analyses. Whether the evidence presented actually is new or newly discover ed, as opposed to newly presented, goes to the merits of whether the refusal to reopen or reconsider a prior decision was proper or lawful. It does not go to the jurisdiction of the court of appeals to review that refusal. Jurisdiction and reviewability are based on the fact that the motion before the STB alleged the existence of new evidence or changed circumstances. See Friends of Sierra, 881 F.2d at 666 ("[W]e determine reviewability solely by examining the bases advanced in the petition to reopen."). That basis for the motion, assuming it is not a pretext, is sufficient alone to confer jurisdiction to review the Board's refusal to expand the identified historic properties and pr otect the entire rail line.

From the record before us, we conclude that FAST sought reopening based on new evidence or changed circumstances, not material error, such that the refusal to reopen is subject to judicial review.

FAST moved within 60 days for reconsideration of the 1997 Order, thus tolling the period for seeking judicial review of the 1997 Order until reconsideration was denied. The 1999 Order denied reconsideration of the refusal to reopen and the petition for review wasfiled within 60 days.

20

We have jurisdiction, therefore, to review the 1997 Order through its denial by the 1999 Order . See BLE, 482 U.S. at 279 (stating that a petition for reconsideration tolls the period for judicial review of the original or der, which can be appealed directly after the petition for r econsideration is denied).

B. THE STB'S JURISDICTION ON REMAND

Norfolk, as intervenor on behalf of the STB, raises a different argument, going to the STB's jurisdiction on remand. Norfolk suggests that, because it has abandoned the Enola Branch, the STB no longer would have jurisdiction on remand to make any deter minations as to the historic status of the line as a whole or to impose mitigation conditions on any non-bridge property. It argues that any decision vacating the STB's original identification decision and remanding the case to the STB would be futile because, beyond the bridges already identified, the STB would be without the power to impose any historic conditions on the abandoned line as a whole.9

It is true, generally, that once a carrier abandons a rail line, the line no longer is part of the national transportation system and the STB's jurisdiction terminates. See Preseault v. ICC, 494 U.S. 1, 5-6 n.3 (1990). Unless the STB attaches post-abandonment conditions to a certificate of abandonment or exemption, such as requir ements under S 106, the authorization of abandonment ends the Board's regulatory mission and its jurisdiction. See id.; Hayfield N. R.R. Co., Inc. v. Chicago & Northwestern T ransp. Co., 474 U.S. 622, 633-34 (1984). The determination of whether a railroad has abandoned a line hinges on the railroad's objective intent to cease permanently or indefinitely all

_____

9. Norfolk raises the issue of the STB's jurisdiction for the first time on
appeal. In opposing FAST's motion to r eopen before the STB, Norfolk never suggested that the STB was without jurisdiction to expand the scope of the historical condition on the rail line. Yet if the STB would have had jurisdiction to expand the historical condition in the 1997 Order, it is not clear why the STB would lack jurisdiction to do the same on remand from our determination that the 1997 Order declining to reopen was in error.

21

transportation service on the line. See Birt v. Surface Transp. Bd., 90 F.3d 580, 585 (D.C. Cir. 1996) (citation and internal quotation marks omitted). Abandonment is considered consummated when the rail line is fully abandoned. See Consolidated Rail Corp. v. Sur face Transp. Bd., 93 F.3d 793, 798 (D.C. Cir. 1996).

We reject Norfolk's argument because there has been no STB finding that Norfolk consummated abandonment of the rail line as an entire property. Following the 1990 Order, Conrail removed all remnants of the railr oad line from the property, including all tracks, ties, rails, signage, and equipment. According to Norfolk, it has been more than ten years since there was activity on the pr operty, more than eight years since there was railroad equipment on the property, and more than seven years since Conrail attempted to negotiate converting the rail into a trail.

But the historical eligibility of the line as a whole does not require the presence of the tracks and other railroad equipment. The historically eligible property, as found by the Keeper and urged by FAST, is the rail line itself, including the trail and all of the bridges. The issue is whether Norfolk has abandoned, sold, or otherwise disposed of any portion of that property, a point on which the record is silent. If, on remand, the STB concludes that Norfolk has disposed of some portion of the line, the STB will be without power to expand the historical condition to cover that property already sold. But the STB otherwise does have the power to expand the historical condition to cover all property not abandoned and to r equire Norfolk to preserve the status quo and not to sell or otherwise disturb or dispose of the rail line pending proper completion of the S 106 process.

IV. HISTORIC ELIGIBILITY OF THE ENOLA LINE

We now proceed to the merits of this petition, whether the STB erred in carrying out its statutory obligations under S 106. Our review is governed by the Administrative Procedure Act (APA), 5 U.S.C. S 706(2), which provides that a court of appeals may "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary,

capricious, an abuse of discretion, or otherwise not in
accordance with law." 5 U.S.C. S 706(2)(A); see Consolidated
Rail Corp. v. United States, 855 F.2d 78, 85 (3d Cir. 1988)
(applying S 706 to review of ICC decision).

As we set out in Part I.B, supra, the NHP A is a
procedural rather than a substantive statute, designed to
ensure that federal agencies take into account the effect on
historic places of federally regulated undertakings. See
Morris County Trust, 714 F.2d at 278-79. The statute
represents a balance between the goals of historic
preservation and the needs of business and community
development. See id. at 280; 37 C.F.R. S 800.1(a). Our
concern on review under the NHPA is less with the
substantive results reached by the STB on the historic
eligibility of the Enola Branch than with the pr ocedures
and reasoning the STB followed in reaching those results.
See Morris County Trust, 714 F.2d at 280. We have agreed
that S 106 is a "stop, look, and listen" provision, requiring
an agency to acquire and consider infor mation prior to
making a decision and approving a federal undertaking. See
Concerned Citizens, 176 F.3d at 695-96 (citing Illinois
Commerce Comm'n, 848 F.2d at 1260-61).

The issue, therefore, is whether the STB touched all the
procedural bases in limiting the scope of the identified
historic properties on the line to the 32 bridges and 36
archaeological areas, in refusing to expand that
identification in 1997 and 1999, in unilaterally approving
the mitigation plan outlined in the draft MOA and the 1999
Order, and in terminating consultation in the 1999 Order.
We conclude that the STB did not touch all the bases. The
STB's decision to terminate the process as it did, and to
provide only limited historic protection, must be vacated
and this matter remanded to the STB for further
proceedings.

A. IDENTIFICATION

Although there would appear to be a lack of constructive
public dialogue in the whole of the S 106 identification
process, FAST did not seek review of the 1990 Order at the
time it issued, nor has FAST formally complained about the

23

early stages of the S 106 identification. W e will begin our analysis therefore with the events occurring after FAST's 1996 petition to reopen and expand the historic condition. In the 1997 and 1999 Orders, the STB concluded that the TWO letter and the letter from the Curator wer e not new or newly discovered evidence in that both pieces of information were available prior to their submission to the STB in 1996. The STB also discounted the SHPO's position as stated in the TWO letter because it was inconsistent with its formal position before the STB and the inconsistency was not explained. In addition, in the 1999 Or der, the STB rejected the Keeper's statement as "pr o forma" and not justifying reopening the identification phase because doing so "would add inexcusable delay to a process that has already taken much too long."

The identification process must, however , be a fluid and ongoing one. "The passage of time, changing per ceptions of significance, or incomplete prior evaluations may require the Agency Official to reevaluate properties previously determined eligible or ineligible." 36 C.F .R. S 800.4(c)(1) (emphasis added). The STB's own regulations also permit it to reopen or reconsider a prior action because of new evidence or substantially changed circumstances. See 49 U.S.C. S 722(c). If we read S 722(c) together with S 800.4(c)(1), these provisions suggest that evidence of changed perceptions of historical significance constitutes evidence of substantially changed circumstances, thus permitting reopening or reconsideration.

In the 1997 and 1999 Orders, however, the STB focused only on whether FAST had submitted new evidence; it did not consider whether FAST had submitted evidence of substantially changed circumstances. This ruling ignores the "changed circumstances" language of S 722(c).

Furthermore, the STB failed to consider the Keeper's statement that the entire Enola Branch line was eligible for designation in the National Register. The ACHP had taken the position that the Keeper's findings wer e necessary before the identification process could be completed. Once the ACHP had brought the Keeper into the pr ocess, the Keeper's conclusions had to be considered. As we noted in Part I.B, supra, the Keeper has been held to have

24

independent authority to determine whether a property should be listed in the National Register. See Moody Hill Farms, 205 F.3d at 558.

The STB ignored the Keeper's determination because of its "untimeliness" and the STB's concer n that considering it would impose additional, inexcusable delay on theS 106 process. This consideration of late timing is, however, inconsistent with S 800.4(c)(1). If the passage of time can be a basis for reevaluation of the identification decision under the regulations, it cannot at the same time be a basis for refusing to consider evidence of changed per ceptions of historical significance. By focusing on the timing of the Keeper's statement and refusing to consider and address its merits, the STB introduced an improper consideration into the identification process. The fact that the STB and the SHPO had previously agreed that the bridges were the only properties that were historically eligible does not and cannot outweigh, without further explanation, the Keeper's determination, whenever that determination was rendered. See Moody Hills, 205 F.3d at 558–59 (stating that the Keeper is not bound by the historic determinations of state and local authorities).

The STB also dismissed the Keeper's statement as"pro forma" and therefore not entitled to serious weight. However, the STB did not indicate in what way the statement was pro forma, nor did it indicate what additional information the Keeper should have presented in its evaluation. The Keeper's evaluation included a lengthy paragraph describing the Enola Branch's overall historic significance; the Board has not explained why the Keeper's position was not entitled at least to some consideration.

The STB is correct in contending that, because it and the SHPO initially did not disagree as to the scope of eligible properties, the STB was not requir ed under the regulations to request a determination from the Secretary of the Interior or from the Keeper. Such a r eferral is required only if the STB and the SHPO do not agree. See 36 C.F.R. S 800.4(c)(2). However, that same r egulation provides that the Secretary or the ACHP can request such a determination at any time, whether or not the STB and the SHPO disagree. See 36 C.F.R.S 800.4(c)(2). Given the

25

authority of the Keeper, it must follow that once that determination has been obtained, it is entitled to some attention by the agency.

Moreover, the fact that the SHPO's position in the TWO letter in 1994, that the entire line was eligible for the National Register, appeared to be a change from its earlier position before the STB was not sufficient gr ounds for the STB not to consider that letter as evidence of changed perceptions. The STB argues that nothing in the statutes or regulations requires it to rethink its decisions whenever an affected party changes its mind. See Connecticut Trust for Historic Preservation v. ICC, 841 F .2d 479, 484 (2d Cir. 1988). However, Connecticut Trust  involved a potential purchaser of the abandoned rail property that changed its mind about which portions of the line it wanted to purchase. See id. That is significantly different from a change of position by the SHPO, which is statutorily empowered to advise the STB throughout theS 106 process and is not an affected party in the same way as a would-be purchaser. The SHPO's revised view as to the eligibility of the entire rail line may represent a changed perception of historic significance or be the result of a more complete evaluation of the property. The SHPO's changed perception should have received some consideration on its merits and should not have been rejected out of hand as an unexplained change of heart.

The STB similarly erred in not giving sufficient consideration to the views of the ACHP. While the ultimate decision on an undertaking remains with the agency implementing it, the ACHP must be affor ded the opportunity to comment and its comments must be taken into account by the agency in rendering its decision. See Concerned Citizens, 176 F.3d at 695 (quoting Waterford Citizens' Ass'n v. Reilly, 970 F.2d 1287, 1290 (4th Cir. 1992)). The agency must make clear that it consider ed the ACHP's opinions, see Concerned Citizens , 176 F.3d at 696, instead of dismissing them as an attempt by the ACHP to "dictate" the STB's procedures.

The ACHP formally became involved in the S 106 process in March 1998, at the request of F AST, during the pendency of FAST's motion for reconsideration. ACHP

26

involvement was not required at the identification stage and the STB did not err in not immediately seeking ACHP comments on identification. However, the ACHP is identified as a source of guidance and advice regar ding the application of the regulations; it also is empowered to enter the S 106 process at any time that it determines that its involvement is necessary to ensure that the purposes and requirements of S 106 are met. See 36 C.F.R. S 800.2(b). Once the ACHP entered the proceedings, the STB, although not required to follow the comments and suggestions of the ACHP at any stage, was required to take these comments into account and to indicate that the comments wer e given genuine attention on their merits. The relevant"agency must demonstrate that it has read and consider ed those recommendations" and "it must make clear in the record that the ACHP's comments were taken seriously." See Concerned Citizens, 176 F.3d at 696.

The record here shows that the ACHP's comments were not taken seriously.10 In several letters to the STB following its decision to participate in the consultation, the ACHP raised its concerns about the way in which historically eligible properties had been identified and its desire to see further consideration of what properties on the rail line

_____

10. The parties dispute the amount of defer ence or weight to be accorded to the ACHP's interpretation of its regulations. FAST relies on our statement in Morris County that "the Advisory Council's regulations are particularly persuasive concerning the pr oper interpretation of NHPA." See Morris County, 714 F.2d at 280. Nor folk points to the statements in Concerned Citizens that found no support for the conclusion that the ACHP's judgments were entitled to great weight. See Concerned Citizens, 176 F.3d at 696 n.6. FAST argues that Concerned Citizens was a case challenging the Federal Highway Administration's compliance with S 4(f) of the Department of Transportation Act, in which the ACHP plays no role. By contrast, the instant case is a challenge to compliance with the ACHP's own regulations under the NHPA. W e need not resolve this matter because, even assuming that the ACHP's judgment is entitled only to minimal weight and that the agency mer ely must afford these comments some attention and consideration, see Concerned Citizens, 176 F.3d at 696, we conclude that the STB in the instant case did not accord the ACHP's comments even that minimal degree of attention and consideration.

27

should be identified as historic. The STB did not respond to these concerns.

Moreover, any delay in ACHP participation and comment may be attributed, at least in part, to the STB. The STB apparently did not, as required, notify the ACHP of its determination of adverse effects at the time of its initial presumptive finding of such effects in 1990. See 36 C.F.R. S 800.6(a)(1) (requiring notification of the ACHP upon a finding of adverse effects). The STB also did not involve the ACHP when requested to do so by FAST , sometime prior to March 1998. Instead, FAST was for ced to contact the ACHP itself, pursuant to 36 C.F.R. S 800.6(a)(1)(ii). As a result, the ACHP did not become involved in the proceedings until March 1998.

Finally, the STB never mentioned or gave any consideration to the detailed statement by Lancaster County, in its 1989 objection to Conrail's Notice of Exemption, as to the historic significance of the line as a whole. The substance of this statement was similar to the comments made by the Keeper in its 1999 deter mination of eligibility. Although the County did not expr essly request a historic condition on the abandonment of the line, its comments provided the STB with initial evidence as to the historical significance of the rail line as a linear source. Like any other evidence from an interested party, this was entitled to some consideration by the Board in identifying historic properties. However, the r ecord does not reflect that the Board ever recognized or consider ed the merits of this statement.

B. TERMINATION OF CONSULTA TION

FAST also challenges the manner in which the STB terminated the regulatory consultation. After declining to reconsider FAST's request to expand the historic condition and protect the entire rail line, the STB unilaterally terminated consultation on mitigation, unilaterally terminated the entire S 106 pr ocess, and imposed the terms of the unexecuted MOA, finding that it "constitutes appropriate historic mitigation for the bridges at issue."

28

The terms of the MOA were established following negotiations among the STB, Conrail, and the SHPO; all three agreed to terms, including r ecordation of five bridges, funding of the film, transfer of certain bridge pr operties to local municipalities, and payment of money by Conrail for upkeep of those bridges. However, the SHPO declined to sign the MOA, citing the ACHP's desire to consult in the process. At that point, the STB was requir ed to invite the ACHP formally to participate in the consultation, and, if the ACHP declined to consult, to obtain the ACHP's comments on the undertaking and on the proposed mitigation plan. See 36 C.F.R. SS 800.6(b)(1)(v), 800.7(c)(2). The STB did submit a copy of the MOA to the ACHP for comment and approval; the ACHP expressly declined to comment on the MOA or the mitigation plan, focusing its comments instead on what it found to be deficiencies in the S 106 process generally and the need to reconsider identification.

The STB certainly has the power to declare consultation at an impasse and to terminate, if it finds that further consultation would not be productive. See  36 C.F.R. S 800.7(a). However, the applicable r egulations require that, if the STB does terminate consultation, it must give notice of that termination to the ACHP, see 36 C.F.R. S 800.7(a)(1); allow 45 days for ACHP comments on termination, see 36 C.F.R. S 800.7(c)(2); and take those comments into account, giving them genuine attention and consideration, in terminating consultation and reaching afinal decision. See 36 C.F.R. S 800.7(c)(4). Only after r eceipt and consideration of those comments may the STB complete the ter mination of the process and implement a mitigation plan, provided that it expressly take such comments into account in rendering that final decision. See Concer ned Citizens, 176 F.3d at 696. The STB did not meet these r equirements for termination.

We can understand the impatience of the STB to resolve this expedited abandonment. Nevertheless, when procedures are established by law, those procedures must be followed. Because the STB did not follow the r equired procedures, we conclude that it abused its discretion in implementing the MOA and in terminating the consultation. For these reasons, the 1997 and 1999 Or ders will be vacated and this matter will be remanded to the STB.

In determining to vacate and remand this matter, we in no way suggest that FAST is entitled to the r elief it seeks. We take no position as to whether the entir e Enola Branch is eligible for inclusion in the National Register or as to whether there is sufficient evidence of changed perceptions of historical significance or changed circumstances to justify preserving the entire line. W e also take no position as to whether the mitigation plan favored by the STB is proper although we note that the ultimate decision is left to the STB after due consideration of comments fr om interested parties. See Concerned Citizens, 176 F.3d at 696. We also take no position as to whether consultation is at an impasse and whether the process properly should be terminated. We hold only that, on r emand, the STB must conduct the S 106 process in accor dance with the regulations. It must consider the comments and opinions of the Keeper, the ACHP, and other inter ested parties as to the scope of the eligible historic properties and as to a proper mitigation plan. If the STB again decides that further consultation is fruitless and that the S 106 process should be termination, it must follow the procedural track established by the regulations for termination.

V. CONCLUSION

For the foregoing reasons, the motion of the STB to dismiss the petition for review is denied. The petition for review is granted and the 1997 and 1999 Or ders of the STB are vacated. This matter is remanded to the Surface Transportation Board for further pr oceedings consistent with this opinion.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

30